UNITED STATES of America,

v.

Coltrane CHIMURENGA, a/k/a "Randolph Simms," a/k/a "Rashid Penderglass," a/k/a "Lionel Jean-Baptiste," a/k/a "The Tall One," a/k/a "Carl," Viola Plummer, a/k/a "June," Roger Wareham, a/k/a "Frank Rogers," a/k/a "Kameel Teen," a/k/a "Frankie," a/k/a "Baldy," Robert Taylor, a/k/a "R.T.," a/k/a "Pizon," a/k/a "Chic," a/k/a "Coach T.," a/k/a "The Ballplayer," Omowale Clay, a/k/a "William Clay," a/k/a "T.," a/k/a "Milton Clyde Hilliard," a/k/a "H. Hilliard," Ruth Carter, a/k/a "Latifa Carter," a/k/a "Anna Carter," a/k/a "Janice," Colette Pean, a/k/a "Carmen Oliveras," a/k/a "Paulette Jackson," a/k/a "Nia," Yvette Kelley, a/k/a "Willie Y. Kelley," a/k/a "Joy Bailey," a/k/a "Cheryl," and Jose Rios, a/k/a "Pepe," a/k/a "Brava," Defendants.

No. S 84 Cr. 818 (RLC).

United States District Court,
S.D. New York.

April 22, 1985.

See also, 609 F.Supp. 1066.

Rudolph W. Giuliani, U.S. Atty. for the S.D.N.Y., New York City, for the U.S.; Kenneth Roth, Lorna G. Schofield, Asst. U.S. Attys., New York City, of counsel.

Lennox Hinds, Stevens, Hinds & White, New York City, for Coltrane Chimurenga.

Michelle S. Jacobs, New York City, for Viola Plummer.

William Mogulescu, Levinson Mogulescu & Kaplan, New York City, for Roger Wareham.

Barry C. Scheck, New York City, for Robert Taylor.

Steven Bernstein, New York City, for Omowale Clay.

Lee A. Ginsberg, Freeman, Nooter & Ginsberg, New York City, for Ruth Carter.

James Silver, New York City, for Colette Pean.

Judith Holmes, Flood, Holmes & Tipograph, New York City, for Yvette Kelley.

Michael Hurwitz, Handelman, Hurwitz & Stampur, New York City, for Jose Rios.

**ROBERT L. CARTER, District Judge.**

Defendants challenge the constitutional validity of the electronic surveillance of Apartment 21F, 1700 Bedford Avenue and of 80 Midwood Avenue, Brooklyn, authorized in this case by order of Judge McLaughlin pursuant to 18 U.S.C. § 2518. The order, initially issued on August 16, 1984, authorized the interception of electronic communications at the two locations and the installation and monitoring of hidden microphones at the Bedford Avenue address. The order was extended on August 24, 1984, September 14, 1984, and October 12, 1984.

The defendants contend that the affidavits supporting the original application, particularly that of FBI Special Agent David Mitchell, contained misstatements and misrepresentations. It is argued that the order authorizing two prior electronic surveillance authorizations, one state and one federal, on which probable cause for the instant application was partially predicated, were themselves defective. It is contended that what the government has proffered through Mitchell as evidence of probable cause is "prosecution by innuendo, and guilt by association; the association being the implied relationship of certain targeted 'black' political groups." (Affidavit of James Silver, par. 17). Reliance on the testimony of Peter Middleton as the basis for probable cause is castigated by defendants. Defendants claim that during the Brinks trial Middleton admitted to lying "on '15 or 20' occasions" to the FBI. *Id.*, par. 21. The government, it is contended, deliberately failed to inform the judge that the subjects of the wiretap were political community workers and that the true purpose of the electronic surveillance was to monitor the activities of a known political group and further to identify the group's membership.

The standard for a finding of probable cause to order electronic surveillance is the same as that for issuance of a search warrant. *United States v. Fury,* 554 F.2d 522, 530 (2d Cir.1977). An affidavit supporting an order for electronic surveillance has a presumption of validity. *Frank v. Delaware,* 438 U.S. 154, 172, 98 S.Ct. 2674, 2685, 57 L.Ed.2d 667 (1978). We have been admonished by the United States Supreme Court that "[i]n dealing

with probable cause ... we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life in which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) quoting from *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily or even usefully, reduced to a neat set of legal rules." *Id.*, 462 U.S. at 232, 103 S.Ct. at 2329. The affidavit is sufficient to support a finding of probable cause if its factual allegations enable the magistrate or judge issuing the order "to make the judgment that the charges are not capricious and are sufficiently supported to justify bringing into play the further steps of the criminal process." *Jaben v. United States*, 381 U.S. 214, 224–25, 85 S.Ct. 1365, 1370–71, 14 L.Ed.2d 345 (1965). "[O]nly the probability, and not a prima facie showing, of criminal activity" is needed to meet the probable cause yardstick. *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

■ In reviewing the sufficiency of the basis for Judge McLaughlin's order, the court is required to make a totality of the circumstances analysis. *Illinois v. Gates, supra*, 462 U.S. at 233, 103 S.Ct. at 2329.

■ After-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts[,]" *Spinelli v. United States* 393 U.S. at 419, 89 S.Ct. at 590, and "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

■ With the standard outlined and the limitations of our examination defined, we now turn to the affidavit of Special FBI Agent David Mitchell which provided the probable cause foundation on which Judge McLaughlin rested his order. Mitchell states that he had learned a great deal about the Brinks operations from government informers. Defendants dismiss one of the informers, Peter Middleton, as an admitted liar and the testimony of government informer Tyrone Rison for the reason that the information supplied by Rison to the government led to the prosecution of thirty-five people but only two were convicted. (Hinds Affidavit, par. 17). The validity of a law enforcement officer's conviction that criminal activity is under way is not measured by the beyond a reasonable doubt standard which is required for a jury finding of guilt. Indeed, that two of the thirty-five persons were convicted gives considerable credence to Rison's information.

Middleton advised Mitchell that in May, 1981, Mutulu Skakur, the head of the original Brinks military unit, discussed with defendant Chimurenga the need to form a "people's militia in New York City." Chimurenga was given responsibility for training on strategy and weapons, and following Sekou Odinga's incarceration, Chimurenga, according to Middleton, became the day-to-day military leader. Moreover, in an intercepted telephone conversation on March 8, 1982, Skakur was overheard speaking of "a militia that Chimurenga started." (Mitchell Affidavit, p. 42). During the same conversation Skakur said that while he was preparing to leave New York, he was helping to select people to continue the New York operation. *Id.* at 43. A gun traced to Chimurenga purchased some years earlier was found in a New Jersey location which the government believes was a safe house for Brinks conspirators. Chimurenga was seen with principals in the Brinks case. He is believed to have visited Odinga at the MCC using a false name. Observations of Chimurenga's activities indicated considerable interest in armored trucks and helicopters.

Rison had testified that extensive armored truck surveillance preceded planned robberies. *Id.* at 56. Chimurenga was ob-

served in his car on February 27, 1984, watching two Brinks armored trucks servicing a Manufacturers Hanover Trust Co. (MHT) bank at Clinton and Pierrepont Streets, Brooklyn, *id.* at 56; and later was seen watching one armored truck service another MHT bank at Ashland Place, and then return to the first observation point, *id.* at 57; later, he was seen watching an armored truck servicing an A & P supermarket at East 64th Street and Second Avenue in Manhattan. *Id.* at 58.

That same day he was seen at the Pan Am Heliport at East 60th Street and F.D.R. Drive and later on went to the Heliport at 34th Street where he inquired about helicopter flight rates and schedules. Later on he and defendant Viola Plummer drove to the Brooklyn House of Detention where Odinga was incarcerated, and Chimurenga was seen directing Plummer's attention to the top of the building. *Id.* at 59. On March 4, Howard Bonds, an unindicted co-conspirator, took a helicopter cruise from 34th Street Heliport. During the flight he spoke to the pilot about taking lessons, inquired about various cockpit buttons, about the range of the helicopter and the feasibility of its use in a rescue operation. *Id.* at 60. On March 23, defendant Roger Wareham came to the 34th Street Heliport and checked several pamphlets and a flyer, used a pay phone and left. *Id.* On March 27, Wareham was seen outside the Brooklyn House of Detention where he appeared to be pacing off distances and counting windows. *Id.*

On February 6, 1984, defendant Yvette Kelley filled out a rental application for an apartment at 37 Lynwood Place in New Haven, Connecticut. The name given on the application, Joy Bailey, was false. The applicant indicated employment at the New York City Housing Preservation Department ("HPD") and that Viola Plummer was her immediate supervisor, giving Plummer's correct business telephone number. Kelley was employed in Newark, New Jersey. Kelley's New York telephone number was listed as that of her former landlord, and the application shows that Carmen

Oliveras (now known to be Colette Pean) would be sharing the apartment. *Id.* at 67.

Kelley lives with defendant Ruth Carter and Pean at 1700 Bedford Avenue. Known visitors to that apartment include Chimurenga, Plummer, Bonds and William Clay. She visited Odinga many times at the MCC, Brooklyn House of Detention and Rikers Island. *Id.* at 14. Kelley accompanied a woman to the Brooklyn House of Detention after Bonds' March, 1984 arrest and posted $1,500 bond for his release. *Id.* at 141. One of the figures (Dixon) in the Brinks case arrested for creating a disturbance had in his possession an address book with the name Yvette (adjacent to the number where Kelley worked). *Id.* at 141.

Middleton identified Howard Bonds, *id.* at 46, Roger Wareham and Robert Taylor, *id.* at 47, as members of the military unit.

Ruth Carter has visited 80 Midwood when Chimurenga, William Clay, Wareham and Plummer were known to be present. There are records of numerous calls between the Carter/Kelley phone and the Wareham/Clay residence phone and the Plummer and Clay HPD phone. *Id.* at 144. On several occasions before the April 16, 1981 killing of one and the critical wounding of another police officer for which James Dixon York was convicted of attempted murder, he was seen on the 21st floor where the Carter/Kelley apartment is located in the building on Bedford Avenue. After this incident, a number of calls from Carter to Michael Dennis Hill were intercepted in which she urgently requested a meeting with him. She refused to give Hill her telephone number or work address over the phone, although she was trying to meet him. *Id.* at 148. Hill was observed entering the 1700 Bedford Avenue apartment complex on July 2, 1981. Hill was seen circling the block at 1700 Bedford a number of times, then placing a call from a pay phone and then meeting with an unidentified black woman who entered the 1700 Bedford apartment after the meeting. *Id.* at 149. Between March and June, 1981, there were three calls from Carter's phone to Hill's house on Long Island, and on August 5,

1981, Hill called Carter's residence from a pay phone on Long Island. *Id.* Carter's phone showed 5 calls to South Carolina between May and August, 1981. *Id.* at 150. During this same period, a call from Hill's phone to South Carolina was intercepted, and shortly thereafter York was arrested fleeing from the building Hill had called. On August 18, 1981, the day after York was arrested, Carter called Hill and asked whether the price tag had been removed from all those dresses. When arrested York had a 9mm automatic handgun from which the serial number had been removed. *Id.* The message was interpreted as asking whether serial numbers had been removed.

Both Chimurenga and Wareham used false identification—the former in February, 1984, when he visited Odinga at MCC by presenting a false HPD identification with his own picture identifying him as Lionel Jean Baptiste. *Id.* at 72. In September, 1983, Wareham applied for a passport in the name of Frank Rogers, giving a bogus New Jersey birth certificate, and he gave Plummer's telephone number at HPD as his office telephone. *Id.* at 70–72. The parties were observed constantly using maneuvers as if to disguise their actual destination.

The defendants argue that the instant surveillance order is defective because it is based on two prior defective wiretap orders. The challenged wiretaps occurred during the investigative attempt by the New York City Police Department to locate James Dixon York and Anthony Nicholas LaBorde who had been indicted for killing a New York City police officer and critically wounding his partner on April 16, 1981. Wiretaps were placed on the telephones of Michael Dennis Hill in Mastic, Long Island and Ruth Carter at 1700 Bedford Avenue. The latter was identified as "Wendy", last name unknown. These two wiretaps are only mentioned in passing in Mitchell's affidavit, and then only as background.

Applying the principles enunciated at the outset, the motion to suppress the fruits of the electronic surveillance authorized in this case must be denied. Under the commonsense standard which must be applied, the Mitchell affidavit provided Judge McLaughlin with a "substantial basis for ... conclud[ing]" that electronic surveillance would uncover evidence of wrongdoing. *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960). That provides a sufficient basis to satisfy 4th and 14th Amendment strictures. *Id.* While if one looks at each of the incidents set forth above in isolation, each might appear innocent, the sum total of these events—the false identification, the surveillance of the armored trucks, the visits to the heliports, the inquiries about the helicopter, the rental of the apartment in New Haven while Odinga was incarcerated in New York City and the failure to pay rent on the apartment once he had been moved, surreptitious visits, that is, under an alias, of Chimurenga to Odinga, his and Wareham's interest in the Brooklyn House of Detention while Odinga was incarcerated, Mitchell's information linking Chimurenga to Brinks participants, verified by observation and through a gun found in a Brinks safehouse which was traced to him, the use of Plummer's and Clay's HPD office to support false applications for rental of the apartment in Connecticut and for Wareham's false passport, the devious maneuvers defendants used in going from one place to the next, taken together add up to probabilities of illegal activity. The Mitchell affidavit is sufficient, therefore, to validate Judge McLaughlin's order. *Illinois v. Gates, supra,* 462 U.S. at 231, 103 S.Ct. at 2328.

■ Nor have defendants made a sufficient showing to warrant an evidentiary hearing. Such a hearing would be justified only on a substantial showing that Mitchell's affidavit is deliberately false or in reckless disregard of the truth, and when the matters allegedly false and in reckless disregard of the truth are put to one side, there is insufficient content in the affidavit to support a finding of probable cause. *Franks v. Delaware,* 438 U.S. 154, 172, 98

S.Ct. 2674, 2685, 57 L.Ed.2d 667 (1978). That standard has not been met.

■ Defendants have also moved for an order compelling the government to provide grand jury records and, in the event of defect, an order dismissing the indictment in this case. The materials requested relate to grand jury due process, alleged misinstruction, and the inspection of grand jury minutes.

There is a presumption of regularity in grand jury proceedings, *United States v. Gordon*, 493 F.Supp. 814, 816–817 (N.D.N.Y.1980), *aff'd*, 655 F.2d 478 (2d Cir.1981), and such presumption can be overcome only by a showing of particularized need or similar compelling necessity. *United States v. Abrams*, 539 F.Supp. 378 (S.D.N.Y.1982) (Stewart, J.).

■ No such showing has been made by defendants with respect to the grand jury proceedings at issue here. First, the need is not sufficiently particularized since "the sweep of these interrogatories is so broad that it suggests what is sought is a general investigation of both the prosecution and the grand jurors and their functionings...." *United States v. Wilson*, 565 F.Supp. 1416, 1437 (S.D.N.Y.1983) (Weinfeld, J.). Second, defendants' motion is based entirely on unsupported surmise and thus does not provide the factual basis necessary to warrant the extraordinary relief of disclosure of grand jury proceedings. *Id.* at 1436; *United States v. Olin Corp.*, 465 F.Supp. 1120, 1134–1135 (W.D.N.Y.1979).

IT IS SO ORDERED.