**UNITED STATES of America, Plaintiff,**

v.

**Dorothy BLACKWELL, a/k/a Dorothy Richardson Blackwell, a/k/a Dorothy Blackwell McNeil, a/k/a Dorothy Richardson and Charles McNeil, Defendants.**

Criminal No. 95–671 (AJL).

United States District Court,
D. New Jersey.

Jan. 21, 1997.

---

**5.** The Bayonne Board has failed to respond to the R.S. argument that attorney fees should be awarded. *See* Reply.

Faith S. Hochberg, United States Attorney, John M. Fietkiewicz, Asst. U.S. Atty., Renee M. Bumb, Asst. U.S. Atty., Office of the United States Attorney, Newark, NJ, for plaintiff.

Peter V. Ryan, West Orange, NJ, for defendant Dorothy Blackwell.

Michael N. Pedicini, Morristown, NJ, for defendant Charles McNeil.

## OPINION

LECHNER, District Judge.

The Grand Jury (the "Grand Jury") returned a fifty-three count indictment (the "Indictment") on 6 December 1996 against defendants Dorothy Blackwell ("Blackwell") and Charles McNeil ("McNeil") (collectively, the "Defendants"), charging embezzlement, 18 U.S.C. § 656, fifty-one counts of money laundering, 18 U.S.C. § 1956(a)(1)(B)(i) ("Section 1956(a)(1)(B)(i)") and conspiracy to commit money laundering, 18 U.S.C. § 1956(h) ("Section 1956(h)"). The Grand Jury filed a superseding indictment (the "Superseding Indictment") on 22 May 1996 and a second superseding indictment (the "Second Superseding Indictment") on 29 May 1996. The differences among these indictments are indicated below.[1]

This opinion addresses the pretrial motions filed by Blackwell[2] on 8 July 1996 to dismiss Count Two of the Second Superseding Indictment ("Count Two"), pursuant to Federal Rule of Criminal Procedure 12 ("Rule 12") (the "Motion to Dismiss"),[3] and for disclosure of grand jury transcripts pursuant to Federal Rules of Criminal Procedure 6(e)(3)(C)(ii) ("Rule 6(e)(3)(C)(ii)") (the "Disclosure Motion").

---

1. Unless otherwise noted, references in this opinion are to the Second Superseding Indictment. Because each of the indictments is divided into several sections and the paragraphs are not numbered consecutively throughout, references to the specific indictment are as follows: [Indictment] ¶ ——, at [page].

2. McNeil joined in Blackwell's 8 July 1996 motions in a letter to the court, dated 18 July 1996.

3. In support of the Motion to Dismiss, Defendants submitted: Brief in Support of Motion to Dismiss Count Two of the Indictment Pursuant to Rule 12(b)(1), Federal Rule of Criminal Procedure (the "Dismissal Brief"), attaching exhibits; Defendant Blackwell's Memorandum of Law in Support of Motion for Disclosure of Grand Jury Transcripts Pursuant to Rule 6(e)(3)(C)(ii), Federal Rule of Criminal Procedure (the "Disclosure Brief") and a letter memorandum in lieu of reply, dated 1 August 1996 (the "Reply").

In opposition, the Government submitted: Government's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Count 2 of the Indictment and Motion for the Production of Grand Jury Transcripts (the "Opposition Brief").

This opinion also addresses the pretrial motion filed by McNeil[4] on 22 March 1996 seeking (1) disclosure of material pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("*Brady*"); (2) disclosure of material pursuant to Rule 404(b) of the Federal Rules of Evidence ("Rule 404(b)"); (3) early disclosure of information discoverable pursuant to the Jencks Act, 18 U.S.C. § 3500 (the "Jencks Act"); and (4) an order pursuant to Rule 104(a) of the Federal Rules of Evidence barring the introduction of co-conspirators' statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence ("Rule 801(d)(2)(E)") and an *in limine* hearing on admissibility of co-conspirators statement (the "Omnibus Motion").[5]

This opinion further addresses four motions filed by the Government shortly before trial. These included: a motion to allow the use of demonstrative charts and summary witnesses at trial (the "Demonstrative Charts and Summary Witnesses Motion"); a motion to allow the introduction of an audit (the "Audit") of the National Westminster Bank, pursuant to Rule 803(6) of the Federal Rules of Evidence ("Rule 803(6)") (the "Rule 803(6) Motion"); a motion to allow the introduction of pre-marked exhibits (the "Pre–Marked Exhibit Motion"); and a motion concerning judicial notice (the "Judicial Notice Motion").[6]

Finally, this opinion addresses Blackwell's sentencing hearing (the "Sentencing Hearing"), held on 5 December 1996. At the Sentencing Hearing, objections to the Department of Probation's presentence investigation report (the "Presentence Investigation Report") were addressed.

*Facts*

A. *The Second Superseding Indictment*

1. *Background*

The following facts are taken from the Second Superseding Indictment. During all times relevant to the Second Superseding Indictment, Blackwell was employed as an operations clerk in the Asset–Based Lending Department at the branch office of the National Westminister Bank of New Jersey ("NatWest") located in the Cherry Hill, New Jersey (the "NatWest Cherry Hill Branch"). Second Superseding Indictment, ¶2 at 1. The job responsibilities for Blackwell included accepting deposits from "asset-based lending customers" of the bank. *Id.*, ¶4 at 2. At the NatWest Cherry Hill Branch, customers gave their deposits, in the form of either cash or checks, to Blackwell who was "required to initial the deposit ticket to acknowledge receipt of the funds, return a copy of the initialed deposit ticket to the customer, and credit the customer's account." *Id.*

Between January 1989 and October 1990, Eastern Music Systems Corporation ("Eastern Music"), one of the NatWest's asset-based lending customers, made deposits consisting of both cash and checks with NatWest at the NatWest Cherry Hill Branch. Second Superseding Indictment, ¶¶5–6 at 2. During this period, Blackwell "failed to deposit at least approximately $470,000.00" in cash delivered by Eastern Music to NatWest (the "Embezzled Money"). *Id.*

McNeil had a personal relationship with Blackwell. Second Superseding Indictment, ¶2 at 4. During the times relevant to the

---

4. Blackwell joined in McNeil's 22 March 1996 motion in a letter, dated 22 March 1996.

5. In support of the Omnibus Motion, Defendants submitted: Defendant's Brief in Support of His Omnibus Notice of Motion (the "Omnibus Brief"). In opposition, the Government submitted: Government's Memorandum of law in Opposition to Defendants' Pretrial Motions and in Support For Reciprocal Discovery (the "Omnibus Opposition Brief").

6. In support of its motions, the Government submitted: Government's Memorandum of Law Concerning the Use of Demonstrative Charts and Summary Witnesses (the "Demonstrative Charts and Summary Witnesses Brief"); Government's Memorandum of Law in Support of Its Motion to Introduce the Audit of National Westminster Bank Pursuant to Federal Rule of Evidence 803(6); the Government's Memorandum of Law in Support of its Motion to Introduce Pre–Marked Exhibit Nos. 96a–1 and 147a (the "Pre–marked Exhibits Brief"); and the Government's Memorandum Concerning Judicial Notice (the "Judicial Notice Brief").

In opposition to the Government's motions, Defendants submitted: letter of Peter V. Ryan, dated 3 September 1996 (the "Blackwell Opposition Letter") and letter of Michael N. Pedicini, dated 29 August 1996 (the "McNeil Opposition Letter").

Second Superseding Indictment, McNeil maintained checking accounts at the Nat-West Cherry Hill Branch (the "McNeil Nat-West Checking Account") and First Fidelity Bank, N.A., Jersey City, New Jersey (the "McNeil First Fidelity Checking Account"), and a savings account at Hudson City Savings Bank ("Hudson City"), Cherry Hill, New Jersey (the "McNeil Hudson City Savings Account") (collectively the "McNeil Accounts"). *Id.*, ¶¶ 2–4. On or about 10 January 1990, Blackwell was given Power of Attorney with respect to the McNeil Hudson City Savings Account. *Id.*, ¶ 4.

On or about 18 January 1990, McNeil obtained a loan from Hudson City of approximately $24,750.00 (the "Hudson City Loan"). Second Superseding Indictment, ¶ 5 at 5. The Hudson City Loan was secured by the McNeil Hudson City Savings Account. *Id.* "Between in or about September 1989 through at least as late as August 1991," McNeil rented a safe deposit box at Hudson City (the "Hudson City Safe Deposit Box"). *Id.*, ¶ 6. In or about January 1990, Blackwell was appointed as McNeil's "deputy" with respect to the Hudson City Safe Deposit Box; she was thereby authorized access to the Hudson City Safe Deposit Box. *Id.*

### 2. *Charges*

The Second Superseding Indictment contained two counts. Count One ("Count One") charged Blackwell, "[b]etween in or about January 1989 and continuing through in or about October 1990, ... knowingly and wilfully embezzled, purloined, and misapplied moneys and funds of [NatWest]" in violation of 18 U.S.C. § 656 ("Section 656"). Second Superseding Indictment, ¶ 7 at 3. Count one also charged Blackwell with aiding and abetting in violation of 18 U.S.C. § 2. *Id.* The applicable statute of limitations for a violation of Section 656 requires an "indictment be returned or the information [be] filed within 10 years after the commission of the offense." 18 U.S.C. § 3293.

Count Two charged Defendants with conspiracy to commit money laundering in violation of 18 U.S.C. § 371 ("Section 371") (the "Conspiracy"). Count Two specifically charged:

Between in or about *January 1989 and continuing through at least as late as April 1992*, [Defendants] knowingly and willfully conspired and agreed with each other to conduct and to attempt to conduct financial transactions, that is, the deposit and withdrawal of money to and from the McNeil Accounts and the payments on the [Hudson City Loan], which financial transactions involved the proceeds of specified unlawful activity, that is, the embezzlement of NatWest's funds, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that these financial transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity[.]

Second Superseding Indictment, ¶ 7 at 5–6.

The Second Superseding Indictment alleged the object of the Conspiracy was to use the Embezzled Money in a manner designed to conceal Blackwell's embezzlement of the money from NatWest. Second Superseding Indictment, ¶ 8 at 6. Defendants were charged with a series of acts taken in furtherance of the Conspiracy: (1) Defendants deposited cash into and later withdrew money from the McNeil Accounts, *id.*, ¶¶ 9–11 at 6–7; (2) McNeil paid off the Hudson City Loan, within five months of obtaining it, "by making eight cash payments totaling $24,-750.00," *id.*, ¶ 12 at 7; and (3) "in or about September 1989 and in or about August 1991," Defendants entered the Hudson City Safe Deposit Box "on at least approximately forty different days." *Id.*, ¶ 13. The Second Superseding Indictment alleged all of the transactions described above "involved at least some of the embezzled NatWest money." *Id.*, ¶ 14.

### 3. *Overt Acts*

The Second Superseding Indictment charged Defendants with committing five overt acts (the "Overt Acts") in furtherance of the Conspiracy:

1. Between in or about January 1989 and in or about April 1991, [Defendants] made and caused to be made cash deposits into

the McNeil NatWest Checking Account ("Overt Act One").

2. Between in or about *October 1989 and at least as late as April 1992*, [Defendants] made and caused to be made cash deposits into the McNeil First Fidelity Checking Account ("Overt Act Two").

3. On or about January 18, 1990, [McNeil] obtained the Hudson City Loan ("Overt Act Three").

4. On or about August 23, 1991, [Defendants] entered the Hudson City Safe Deposit Box ("Overt Act Four").

5. On or about August 23, 1991, [Defendants] surrendered the Hudson City Safe Deposit Box ("Overt Act Five").

Second Superseding Indictment at 8–9 (emphasis added).

B. *The Indictment and the Superseding Indictment*

As indicated, the Indictment charged Blackwell with embezzlement and Defendants with fifty-one counts of money laundering in violation of Section 1956(a)(1)(B)(i) and one count of conspiracy to commit money laundering in violation of Section 1956(h). Count Fifty–Three of the Indictment charged:

Between in or about *January 1989 and continuing through in or about October 1990* ... [D]efendants ... knowing that the property involved in the financial transactions as described above, represented the proceeds of some form of unlawful activity, and knowing that each of these financial transactions was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful, that is, the embezzlement of NatWest's funds, knowingly and willfully conspired and agreed with each other and others to conduct and to attempt to conduct each of these financial transactions, which in fact involved the proceeds of said specified unlawful activity, contrary to *Title 18, United States Code, Section 1956(a)(1)(B)(i)* .... All in violation of Title 18, United States Code, *Section 1956(h).*

Indictment, ¶2 at 9 & p. 10 (emphasis added).

The Superseding Indictment contained two counts. Count One charged Blackwell with embezzlement in violation of Section 656. Count Two charged Defendants with conspiracy to engage in money laundering in violation of Section 1956(h). Count Two charged:

Between in or about *January 1989 and continuing through at least as late as April 1992* ... [D]efendants ... knowingly and willfully conspired and agreed with each other to conduct and to attempt to conduct financial transactions ... knowing that the money involved ... represented the proceeds of some form of unlawful activity, and knowing that these financial transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, contrary to [*Section 1956(a)(1)(B)(i)* ] .... All in violation of Title 18, United States Code, *Section 1956(h).*

Superseding Indictment, ¶7 at 5–6 & p. 8 (emphasis added).

C. *Comparison of the Indictments*

The charge against Blackwell for embezzlement under Section 656 remained undisturbed in all three indictments. The two superseding indictments, however, eliminated the fifty-one counts of money laundering under Section 1956(a)(1)(B)(i) contained in the Indictment.

The most important differences among the indictments for the purposes of the Motion to Dismiss, however, were the changes made in the Conspiracy charge. As indicated, the Indictment charged Defendants with conspiracy to commit money laundering under Section 1956(h). The Conspiracy, as charged in the Indictment, was alleged to have occurred "[b]etween in or about January 1989 ... [and] in or about October 1990" and only concerned transactions made at the McNeil NatWest Checking Account.

The Superseding Indictment changed the time-frame of the Conspiracy; it alleged the Conspiracy existed between "in or about January 1989 and continuing through at least as

late as April 1992." Superseding Indictment, ¶ 7 at 5. The Conspiracy, as charged in the Superseding Indictment, implicated transactions at all the McNeil Accounts. *Id.*, ¶¶ 2–4 at 4–5. The Superseding Indictment further alleged the pay-off of the McNeil Hudson City Loan and Defendants' visits to the McNeil Hudson City Safe Deposit Box were acts in furtherance of the Conspiracy. *Id.*, ¶ 12, 13 at 7–8. The Superseding Indictment alleged the indicated transactions "involved at least some of the embezzled NatWest money" and charged Defendants with a violation of Section 1956(h). *Id.*, ¶ 14 at 8.

The Second Superseding Indictment changed the statutory basis for the Conspiracy charge; instead of charging the Conspiracy under Section 1956(h), it charged the Conspiracy under Section 371. Second Superseding Indictment at 9. As indicated, the Second Superseding Indictment also alleged five specific Overt Acts taken by Defendants in furtherance of the Conspiracy. *Id.* at 8–9.

*Discussion*

A. *Statute of Limitations*

1. *Rule 12(b)*

Under Rule 12(b),[7] defenses which are "capable of determination without trial of the general issue may be raised before trial by motion." *Id.* The 1944 Advisory Committee Note on Rule 12(b)(1) and (2) sheds considerable light on the Rule's interpretation. As the Advisory Committee observed, subdivisions (1) and (2) of the rule classify into two groups all objections and defenses to be interposed by motion pursuant to Rule 12(b):

In one group are defenses and objections which must be raised by motion, failure to do so constituting a waiver. In the other group are defenses and objections which at the defendant's option may be raised by motion, failure to do so, however, not constituting a waiver. . . .

In the . . . group of objections and defenses, which the *defendant at his [or her]* *option may raise by motion before trial,* are included all defenses and objections which are capable of determination without a trial of the general issue. They include such matters as former jeopardy, former conviction, former acquittal, *statute of limitations,* immunity, lack of jurisdiction, failure of indictment or information to state an offense, etc.

Rule 12(b)(1), (2) Advisory Committee Note (citations omitted, emphasis added).

▮ As the Advisory Committee Note makes clear, the statute of limitations defense is a defense "which the defendant at his [or her] option may raise by motion before trial." Rule 12(b)(1), (2) Advisory Committee Note. Rule 12(e) further provides "[a] motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict." *Id.*

▮ If the defense is "substantially founded upon and intertwined with" evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and should be deferred until trial. *United States v. Williams,* 644 F.2d 950, 952–53 (2d Cir.1981); *see* Fed.R.Crim.P. 12(b); *United States v. Doe,* 63 F.3d 121, 125 (2d Cir.1995); *United States v. Wilson,* 26 F.3d 142, 159 (D.C.Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1430, 131 L.Ed.2d 311 (1995); *United States v. Shortt Accountancy Corp.,* 785 F.2d 1448, 1452 (9th Cir.), *cert. denied,* 478 U.S. 1007, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986); *United States v. Conley,* 859 F.Supp. 909, 927–28 (W.D.Pa. 1994) (" 'A defense is . . . "capable of determination" if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.' ") (quoting *United States v. Covington,* 395 U.S. 57, 60, 89 S.Ct. 1559, 1561, 23 L.Ed.2d 94 (1969)). A motion to dismiss the indictment should consider only

---

7. Rule 12(b) provides in pertinent part:
 Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. . . . The following must be raised prior to trial:

 (1) Defenses and objections based on defects in the institution of the prosecution.
 (2) Defenses and objections based on defects in the indictment or information. . . .
 *Id.*

those objections that are "capable of determination without the trial of the general issue;" evidentiary questions should not be determined at that stage. *United States v. Knox,* 396 U.S. 77, 83 n. 7, 90 S.Ct. 363, 367 n. 7, 24 L.Ed.2d 275 (1969).

■ "[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Grunewald v. United States,* 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957). In such cases it is often difficult to separate the limitations claim from the facts of the case and issues of guilt and innocence to be established at trial. *Id.; United States v. Cannistraro,* 800 F.Supp. 30, 78 (D.N.J.1992) (the ultimate question of whether acts are in furtherance of conspiracy depends on objective of conspiracy, a question of fact for the jury); *see e.g., United States v. McLaughlin,* 910 F.Supp. 1054, 1063 (E.D.Pa.1995).

■ The sufficiency of an indictment may not be properly challenged by a pretrial motion on the ground that it is not supported by adequate evidence. *Knox,* 396 U.S. at 83 n. 7, 90 S.Ct. at 367 n. 7; *United States v. Donsky,* 825 F.2d 746, 751 (3d Cir.1987); *United States v. Gunter,* 631 F.2d 583, 586 (8th Cir.1980); *United States v. Gallagher,* 602 F.2d 1139, 1142 (3d Cir.1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 729, 62 L.Ed.2d 728 (1980); *United States v. Galati,* 853 F.Supp. 152, 154 (E.D.Pa.1994).

B. *Money Laundering Under Section 1956(a)(1)(B)(i)*

As indicated, Count Two charged Defendants with the Conspiracy, the object of which was "to conceal and disguise the proceeds of ... unlawful activity, contrary to [Section 1956(a)(1)(B)(i) ]." Second Superseding Indictment, ¶ 7 at 5–6. Section 1956(a)(1)(B)(i) provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct ... a financial transaction which in fact involves the proceeds of specified unlawful activity—knowing the transaction is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity.... shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

*Id.*

■ To establish a violation of Section 1956(a)(1)(B)(i), the Government must prove (1) a defendant took part in a financial transaction involving the proceeds of a specified unlawful activity, (2) the defendant knew the property involved was the proceeds of a specified unlawful activity, and (3) the defendant knew the transaction was designed in whole or in part to conceal or disguise the proceeds. 18 U.S.C. § 1956(a)(1)(B)(i); *United States v. Reynolds,* 64 F.3d 292, 297 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 969, 133 L.Ed.2d 890 (1996); *United States v. Garza,* 42 F.3d 251, 253 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2263, 132 L.Ed.2d 268 (1995); *United States v. West,* 22 F.3d 586, 590–91 (5th Cir.), *cert. denied,* 513 U.S. 1020, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994); *United States v. Paramo,* 998 F.2d 1212, 1216–17 (3d Cir.1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994); *see United States v. Carr,* 25 F.3d 1194, 1206 (3d Cir.1994) (interpreting the analogous subsection, 18 U.S.C. § 1956(a)(2)(B)(i), which prohibits the transportation of the "proceeds of ... unlawful activity" from the United States in order to conceal the "source, the ownership or the control of the proceeds"), *cert. denied,* 513 U.S. 1086, 115 S.Ct. 742, 130 L.Ed.2d 643 (1995); *United States v. Campbell,* 977 F.2d 854, 857 (4th Cir.1992), *cert. denied,* 507 U.S. 938, 113 S.Ct. 1331, 122 L.Ed.2d 716 (1993); *United States v. Massac,* 867 F.2d 174, 177–78 (3d Cir.1989).

A "financial transaction" is:
(A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds

by wire or other means, or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect interstate or foreign commerce in any way or degree[.]

18 U.S.C. § 1956(c)(4). Examples of financial transactions include

a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, *use of safety deposit box*, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected[.]

18 U.S.C. § 1956(c)(3) (emphasis added).

Congress added the "use of a safe deposit box" to the definition of transaction in 1992. Pub.L. 102–550, § 1527(a)(2). The effective date of the 1992 amendments was 25 October 1992. *See* 18 U.S.C.A. § 1956—Historical and Statutory Notes at 70. Accordingly, at the time Defendants allegedly committed Overt Acts Four and Five, involving the Hudson City Safe Deposit Box, the use of a safe deposit box was not included in the statutory definition of a "financial transaction." *See id.; United States v. Bell,* 936 F.2d 337, 341–42 (7th Cir.1991).

■ As indicated, in order to convict a defendant of a violation of Section 1956(a)(1)(B)(i), the Government must prove the defendant knowingly conducted a financial transaction involving the proceeds of a specified unlawful activity in order to conceal or disguise the proceeds. *Reynolds,* 64 F.3d at 297. "Conducting" a financial transaction includes "initiating, concluding, or participating in the initiating, *or* concluding of a transaction." 18 U.S.C. § 1956(c)(2) (emphasis added). There is no requirement a transaction be both initiated and concluded; accordingly, a violation of Section 1956(a)(1)(B)(i) occurs and the statute of limitations begins running when a deposit is initiated. *United States v. Li,* 55 F.3d 325, 330 (7th Cir.1995).

■ Each money laundering transaction constitutes a separate violation of Section 1956(a)(1)(B)(i). *United States v. Martin,* 933 F.2d 609, 611 (8th Cir.1991). The Senate Report on the 1986 money laundering statute expresses the intent of Congress to make each money laundering transaction a separate offense:

Section 1956(c)(3) defines the term "transaction to include various activities involving financial institutions such as a deposit, an exchange of funds, a transfer between accounts, and the purchase of stock or certificates of deposit.... It should be noted that each transaction involving "dirty money" is intended to be a separate offense. For example, a drug dealer who takes [one] million [dollars] in cash from a drug sale and divides the money into smaller lots and deposits it in 10 different banks has committed 10 distinct violations of the new statute. If he then withdraws some of the money and uses it to purchase a boat or condominium, he will have committed two more violations, one for the withdrawal and one for the purchase.

S.Rep. No. 433, 99th Cong., 2d Sess. 13 (1986); *accord Martin,* 933 F.2d at 611; *United States v. Blackman,* 904 F.2d 1250, 1257 (8th Cir.1990) (the deposit of money in a bank and the subsequent use of that money to purchase a house equal two separate transactions).

In *Martin,* for example, the defendant conducted two transactions involving the payment of cash for stock. 933 F.2d at 611. The court held that each transaction constituted a separate financial transaction as that word is defined under 18 U.S.C. § 1956(c)(4). *Id.* The *Martin* court observed different evidence was necessary to prove each count; the transactions at issue "occurred on different dates and in different locations, and involved different amounts of money." *Id.* at 611.

In *Martin,* the defendant argued that counts III and IV of the indictment, both of which charged him with money laundering, were "multiplicious." 933 F.2d at 611. He argued the transactions involved were of an ongoing nature and, therefore, "constituted a

single continuous transaction which could not form the basis of two separate criminal offenses." *Id.*

The court characterized the defendant's argument as an assertion that "once he had engaged in one act of money laundering, he could continue to engage in subsequent acts of money laundering with impunity." *Martin*, 933 F.2d at 611. The court rejected this argument, concluding: "[I]t is the individual acts of money laundering which are prohibited under [S]ection 1956(a)(1)(B)(i), and not the course of action. which those individual acts may constitute.... [T]he activities charged in ... the indictment were not multiplicious." *Id.*

### 2. *Conspiracy under Section 371*

■ In order to prove conspiracy to commit money laundering under Section 371, the Government must establish (1) a conspiracy to commit money laundering was formed, (2) during the life of the conspiracy, a conspirator committed an overt act in furtherance of the conspiracy, and (3) during the life of the conspiracy, the defendant knowingly joined the conspiracy.[8] *United States v. Conley*, 37 F.3d 970, 976 (3d Cir.1994); *Carr*, 25 F.3d at 1201 (citing *United States v. McGlory*, 968 F.2d 309, 321 (3d Cir.), *cert. denied*, 507 U.S. 962, 113 S.Ct. 1388, 122 L.Ed.2d 763 (1992)); *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir.1989) (citing *United States v. Shoup*, 608 F.2d 950, 956 (3d Cir.1979)).

■ A conspirator "remains a participant in the [conspiracy] unless and until he [or she] communicates or otherwise objectively manifests a decision to renounce the agreement." *United States v. Rosa*, 891 F.2d 1063, 1069 (3d Cir.1989). The Government, moreover, is not required to prove every defendant had "[k]nowledge of all the particular aspects, goals, and participants of a conspiracy ... to sustain a conviction." *United States v. Adams*, 759 F.2d 1099, 1114 (3d Cir.) (citing *Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed.

154 (1947)), *cert. denied*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. Giampa*, 904 F.Supp. 235, 330 n. 106 (D.N.J.1995).

■ "[A] conviction for conspiracy does not require that every element of the crime be proven with direct evidence." *Carr*, 25 F.3d at 1201; *McGlory*, 968 F.2d at 321; *United States v.· Wexler*, 838 F.2d 88, 90–91 (3d Cir.1988). In fact, the Government may rely entirely on circumstantial evidence to "prove that an alleged conspirator had the knowledge and intent necessary to commit the crime." *United States v. Anderskow*, 88 F.3d 245, 253 (3d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 613, 136 L.Ed.2d 537 (1996); *United States v. Schramm*, 75 F.3d 156, 159 (3d Cir.1996);, *Carr*, 25 F.3d at 1201; *United States v. Iafelice*, 978 F.2d 92, 96–98 (3d Cir.1992); *McGlory*, 968 F.2d at 321. As the Circuit observed in *Iafelice*, "[i]t is not unusual that the government will not have direct evidence. Knowledge is often proven by circumstances." 978 F.2d at 98. "When the Government relies entirely on circumstantial evidence, however, 'the inferences drawn must have a logical and convincing connection to the facts established.'" *Carr*, 25 F.3d at 1201 (quoting *United States v. Casper*, 956 F.2d 416, 422 (3d Cir.1992)); *see United States v. McNeill*, 887 F.2d 448, 450 (3d Cir.1989) (circumstantial evidence is no less probative than direct evidence) (citing *United States v. Bycer*, 593 F.2d 549, 551 (3d Cir.1979)), *cert. denied*, 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990).

#### a. *Overt Acts*

■ Section 371 contains an explicit requirement that a conspirator perform an "act to effect the object of the conspiracy." 18 U.S.C. § 371; *see also United States v. Small*, 472 F.2d 818, 819–20 (3d Cir.1972) ("Commission of an overt act by one of the conspirators is an essential element of the crime of conspiracy."). An overt act is an act knowingly committed by one of the conspira-

---

8. Section 371 provides:

 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and

one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than·five years, or both.
 *Id.*

tors when an effort is made to effect, achieve or accomplish some object or purpose of the conspiracy. *Conley,* 37 F.3d at 976; *Rankin,* 870 F.2d at 113.

▮ The Government is not limited in its proof at trial to those overt acts alleged in the indictment. *United States v. Adamo,* 534 F.2d 31, 38 (3d Cir.), *cert. denied,* 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). Moreover, the Government is under no obligation to prove every overt act alleged. *Id.* Reliance by the Government at trial on overt acts not included in the indictment is not fatal to a conspiracy charge absent a showing of prejudice to the defendant. *Id.* at 38–39; *see United States v. Schurr,* 794 F.2d 903, 907 n. 4 (3d Cir.1986) ("It is well settled that the government can prove overt acts not listed in the indictment, so long as there is no prejudice to the defendants thereby."); *see also United States v. McDade,* 28 F.3d 283, 301 (3d Cir.1994) ("[T]he absence of ... overt acts from the indictment [does] not in itself preclude the prosecution from proving them or from relying on such proof to satisfy the overt act requirement contained in [Section] 371"), *cert. denied,* —— U.S. ——, 115 S.Ct. 1312, 131 L.Ed.2d 194 (1995); *United States v. DiPasquale,* 740 F.2d 1282, 1294 (3d Cir.1984) ("variance is permissible unless it deprives the defendant of fair notice or places him [or her] in danger of double jeopardy"), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985); *United States v. U.S. Gypsum Company,* 600 F.2d 414, 419 (3d Cir.), *cert. denied,* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979).

▮ The same overt acts charged in a conspiracy count may also be charged and proved as substantive offenses, " 'for the agreement to do the act is distinct from the act itself.' " *United States v. Felix,* 503 U.S. 378, 390, 112 S.Ct. 1377, 1384, 118 L.Ed.2d 25 (1992) (quoting *United States v. Bayer,* 331 U.S. 532, 542, 67 S.Ct. 1394, 1399, 91 L.Ed. 1654 (1947) and citing *Pinkerton v. United States,* 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946) ("[T]he commission of

the substantive offense and a conspiracy to commit it are separate and distinct offenses.")); *see also Garrett v. United States,* 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985) ("[C]onspiracy is a distinct offense from the completed object of the conspiracy."); *Iannelli v. United States,* 420 U.S. 770, 777–79, 95 S.Ct. 1284, 1289–91, 43 L.Ed.2d 616 (1975).

▮ An overt act itself, however, need not be criminal in nature if considered apart from the conspiracy. *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 101–02, 87 L.Ed. 23 (1942) (Overt act need not be a crime and need only be that of a single conspirator.); *United States v. Medina,* 761 F.2d 12, 15 (1st Cir.1985) (citing *Yates v. United States,* 354 U.S. 298, 334, 77 S.Ct. 1064, 1084–85, 1 L.Ed.2d 1356 (1957)). As long as the act follows and tends toward the accomplishment of the plan or scheme and is knowingly done in furtherance of some object or purpose of the conspiracy charged in the indictment, it satisfies the overt act requirement. *United States v. Palmeri,* 630 F.2d 192, 200–01 (3d Cir.1980), *cert. denied,* 450 U.S. 467, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981); *Adamo,* 534 F.2d at 38; *see United States v. Barone,* 458 F.2d 1027, 1029 (3d Cir.1972) (introduction by defendant of conspirator to a prospective participant in conspiracy deemed an overt act in furtherance of conspiracy).

### b. *Section 3282*

In addition to proving the elements of the Conspiracy, the Government must also satisfy the requirements of the statute of limitations, which requires the Conspiracy charge be brought within five years of the date of the offense. 18 U.S.C. § 3282 ("Section 3282").[9] The Second Superseding Indictment was returned on 29 May 1996. It is therefore incumbent on the Government to prove the Conspiracy was still in existence on 29 May 1991 and that at least one Overt Act was performed on or after that date. 18

---

9. Section 3282 provides:
 Except as otherwise expressly provided by law, no person shall be prosecuted, tried or punished for any offense, not capital, unless

the indictment is found or the information is instituted within five years next after such offense shall have been committed.
*Id.*

U.S.C. § 3282; *Grunewald,* 353 U.S. at 396, 77 S.Ct. at 969–70; *see United States v. Roshko,* 969 F.2d 1, 6–7 (2d Cir.1992).[10] "For where substantiation of a conspiracy charge requires proof of an overt act, it must be shown both that the conspiracy still subsisted within the [five years] prior to the return of the indictment, and that at least one overt act in furtherance of the conspiratorial agreement was performed within that period." *Grunewald,* 353 U.S. at 397, 77 S.Ct. at 970. As indicated, "the crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement...." *Id.*

### c. The Defense Arguments

As indicated, Defendants argued Count Two should have been dismissed because the statute of limitations had run. Dismissal Brief at 15. Defendants specifically argued:

(1) The first and second superseding indictments are beyond the statute of limitations....

(2) With respect to computation of the limits of the statute of limitations, May 22, 1996, the date the first superseding indictment was made public, is the operative date;[11]

(3) The overt acts/uncharged conduct numbered one (1) to five (5) are beyond the statute of limitations and are, therefore, untimely;

(4) The overt acts/uncharged conduct numbers four (4) and five (5) designated as "safe deposit box transactions" were not criminally sanctioned at the time of their occurrence and, as a result, have no probative value. As such each is subject to being stricken from the true bill;

(5) The inference upon inference that the government asks the Court to embrace as circumstantial evidence of culpability premised on the overt acts enumerated

have no "logical or convincing connection to the facts established" and are, accordingly, inadmissible under Rules 401–402 and 403, Federal Rules of Evidence.

Dismissal Brief at 15–16.

Defendants argued the Overt Acts charged in the Second Superseding Indictment "although not advanced as independent offenses, [were] object crimes of the conspiracy. In other words, they could have been set forth as such and labeled 'transactions' under 18 U.S.C. [§§] 1956(a)(1)(B)(i) and 1956(c)(3) and (4)." Dismissal brief at 17. "As a consequence ... the overt acts ... [fell] prey to the statute of limitations." *Id.* at 18.

Defendants also offered four reasons why the "bank activity" at the McNeil First Fidelity Checking Account was insufficient as a basis to infer an ongoing conspiracy to launder money:

[F]irst, ... "concealing" the monies through bank transactions could not have taken eighteen (18) months from the last unlawful withdrawal of the monies by Ms. Blackwell.... Second, ... the money laundering act becomes final, and an instant violation at the time of the deposit. Third, assuming ... that there were subsequent withdrawals from NatWest, First Fidelity, and Hudson City, these acts ... cannot be utilized to perpetuate the conspiracy based on the *United States v. Li* rationale and the case law related to concealment/object of the conspiracy line of cases that follow *Grunewald,* to analyzed forthwith. Fourth, the goal of the conspiracy was accomplished shortly after the embezzlements, and certainly not later than December 4, 1990.

Dismissal Brief at 20–21.

Defendants essentially argued the "initial 'transactions,'" completed the act of money laundering and therefore "completed the object of the conspiracy." Dismissal Brief at

---

**10.** Defendants asserted 22 May 1991, five years before the filing date of the Superseding Indictment, was the statute of limitations cut-off date. Dismissal Brief at 18. The Government, however, set 29 May 1991, five years before the filing date of the Second Superseding Indictment as the cut-off date. Opposition Brief at 7. The seven-day difference in dates does not impact on

the decision. For the purposes of the instant opinion, the later date, 29 May 1991, will be considered the cut-off date for the statute of limitations.

**11.** As indicated, 29 May 1991 will be considered the cut-off date for the purposes of this opinion.

21. These "initial transactions," Defendants argued, were made immediately following the embezzlement and any transactions thereafter could not be construed as money laundering. *Id.* at 22. Defendants, moreover, argued the payment of the McNeil loan from money taken from "an account that the government alleges was used to 'launder'" cannot constitute an act of laundering because the "formal act of money laundering" was complete when the money was deposited into the account. *Id.*

Defendants argued, therefore, the activity set forth in the Count Two of the Second Superseding Indictment occurred after the Conspiracy had concluded and were "acts of concealment" that could not support the Conspiracy charge. *Id.* at 23 (citing *Grunewald*, 353 U.S. at 397, 77 S.Ct. at 970).

Finally, Defendants argued none of the Overt Acts charged in Count Two of the Second Superseding Indictment could support the Conspiracy charge:

> Overt Act One declares that between July 1989 and April 1991, Blackwell and McNeil "made or caused to be made cash deposits into the McNeil NatWest checking account," while [Overt Act] Three maintains that McNeil obtained a loan from "Hudson City" on January 18, 1990.

Dismissal Brief at 26. Defendants argued, because they occurred before "the cutoff date for the statute of limitations," Overt Acts One and Three could not support the Conspiracy charge. Dismissal Brief at 26.

Defendants argued the transactions involving the Hudson City Safe Deposit Box, Overt Acts Four and Five, were without legal effect. Dismissal Brief at 27. Defendants' argument was based upon the fact the use of a safe deposit box did not constitute a financial transaction under the money laundering statute in effect during the relevant times. *Id.* at 27. Defendants moved "to have these attributions stricken from the record." Dismissal Brief at 27.

Defendants argued the transactions at the McNeil First Fidelity Checking Account set forth as Overt Act Two in the Superseding Indictment could not support the Conspiracy charge.

> Overt Act Two relates that the accused "made or caused to be made cash deposits into the McNeil First Fidelity checking account" between October 1989 and "at least as late as April 1992." Relying on a piecemeal approach, any bank transaction on or prior to May 21, 1991 would be faulty on statute of limitations' grounds. Any bank business after May 21, 1991 would have to pass the test of accepted inferences by having a "reasonable and convincing connection to the established facts." ... Despite termination of the embezzlement in October 1990, the government erroneously posits the above transactions happening one and one-half years later were part of the money laundering. This proposition is insupportable and a product of speculation and surmise. Indeed, the [Second Superseding Indictment] candidly remarks that the "transactions discussed above involved *at least some* of the embezzled NatWest money."

Dismissal Brief at 27.

In support of their argument that the transactions charged as Overt Act Two were too far removed from the embezzlement to be in furtherance of a money laundering conspiracy, Defendants provided a summary of activity reflected in the McNeil First Fidelity Checking Account records from 29 May 1991 through 5 May 1992. *See* Summary of the McNeil First Fidelity Checking Account Records attached to Reply Brief as Exhibit A ("Summary of Activity"). The Summary of Activity indicated "31 cash deposits in the twelve month period totaling $10,863.90 or an average of $350.00 per cash deposit." Reply Brief at 3. This activity, according to Defendants, was indicative of normal banking activity, not money laundering. Reply Brief at 3–4.

In summary, Defendants appeared to argue that none of the Overt Acts charged in Count Two of the Second Superseding Indictment could support the Conspiracy charge because (1) Overt Acts One and Three were outside the statute of limitations, (2) Overt Acts Four and Five were not included as "transactions" under Sections 1956(a)(1)(B)(i) and 1956(c)(3) at the time they were made, and (3) the transactions

alleged as Overt Act Two that were within the statute of limitations did not bear a "reasonable and convincing connection" to Defendants' money laundering. Dismissal Brief at 24–27.

### 3. *Analysis of the Defense Arguments*

■ As indicated, to convict a defendant of conspiracy to commit money laundering in violation of Section 371, the Government must prove a conspiracy was formed, at some time during the period of the conspiracy a conspirator performed or caused to be performed an overt act or acts in order to "further or advance" the purpose of the agreement and finally, at some time during the period of the conspiracy, the defendant, knowing the purpose of the conspiracy, joined the conspiracy. *Conley*, 37 F.3d at 976. In addition, the Government must prove one overt act within the five-year limitations period. *Grunewald*, 353 U.S. at 397, 77 S.Ct. at 970; *Schurr*, 794 F.2d at 907; *United States v. Butler*, 792 F.2d 1528, 1533 (11th Cir.1986), *cert. denied*, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986); *United States v. Girard*, 744 F.2d 1170, 1173 (5th Cir.1984); *Adamo*, 534 F.2d at 38.

Count Two alleged: "The object of the conspiracy was to use the embezzled money in a manner designed to conceal the fact that [Blackwell] had embezzled the money from NatWest." Second Superseding Indictment, ¶ 8 at 6. Count Two also alleges the Conspiracy began in or about January 1989 and continued through at least as late as April 1992. Id., ¶ 7 at 5. The Second Superseding Indictment, therefore, properly alleged a conspiracy falling within the five year statute of limitations.

Defendants' argument that the Conspiracy was completed "immediately" when they "hid" the embezzled money in the McNeil accounts shortly after the embezzlement and that any actions taken thereafter were merely "routine means of cover-up" was unpersuasive; Defendants' reliance on *Grunewald* was misplaced.

In *Grunewald*, the defendants were charged and convicted of conspiracy to defraud the United States by fixing tax fraud cases in order to get "no prosecution rulings"

from the Internal Revenue Service. 353 U.S. at 393–94, 77 S.Ct. at 968–69. The Court was faced with the question of whether the prosecution was barred by the applicable statute of limitations. *Id.* at 394, 77 S.Ct. at 968–69. The Court held the "crucial question" in determining whether the statute of limitations has run in a conspiracy is the scope of the agreement, "for it is that which determines duration and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Id.* at 397, 77 S.Ct. at 970.

The Court rejected the Government's argument the cover-up should be regarded as part of the conspiracy. Applying the standards set forth in *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949) and *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), the *Grunewald* Court stated:

> The crucial teaching of *Krulewitch* and *Lutwak* is that after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and the conspirators took care to cover up their crime in order to escape detection and punishment.

353 U.S. at 401–02, 77 S.Ct. at 972.

The Court observed:

> [E]very conspiracy is by its very nature secret; a case can hardly be supposed where [criminals] concert together for crime and advertise their purpose to the world. And again, every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the Government's theory would be for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind· co-conspirators.

*Id.* at 402, 77 S.Ct. at 972.

The Court, however, cautioned:

> By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a vital distinction must be made between

acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

*Grunewald,* 353 U.S. at 405, 77 S.Ct. at 974 (emphasis in original). The Court concluded that where the conspiratorial agreement included an agreement to conceal the conspiracy, the statute of limitations does not commence until after the acts of concealment are completed. *Id.* The ultimate question of whether acts are in furtherance of the conspiracy, therefore, depends on the objectives of the conspiracy, "a determination which is a question of fact for the jury." *Cannistraro,* 800 F.Supp. at 78.

The argument by Defendants that "multiple transactions" in the McNeil Accounts could not have been "part of or in furtherance of the main conspiracy" based on the "rationale" announced by the court in *United States v. Li,* 856 F.Supp. 421, 423 (N.D.Ill. 1994), *aff'd,* 55 F.3d 325 (7th Cir.1995) was also misplaced. First, the decision in *Li* concerned only the crime of money laundering under Section 1956(a)(1)(B)(i), not a conspiracy under Section 371. *Id., passim.* Second, Defendants misinterpreted the holding in *Li.*

Defendants argued the initial deposits of the Embezzled Money into the McNeil Accounts completed the money laundering offenses and "latter or subsequent transactions/use of these identical monies cannot be conceived as further criminal acts." Dismissal Brief at 23. Defendants wrongly read the holding in *Li* to mean that "latter or subsequent transactions/use of these identical monies" cannot constitute money laundering. *Id.*

In *Li,* a check was deposited with a bank on 15 December 1988; the bank, however, did not process the check until the next day. 856 F.Supp. at 423. The court held the act of initiating the deposit of the check completed the money laundering offense and started the running of the statute of limitations. *Id.* Because 15 December 1988 fell outside the statute of limitations, the court affirmed the district court's judgment of acquittal on money laundering count. *Id.* The Seventh Circuit affirmed, holding a money laundering transaction is complete and the statute of limitations begins running upon the "initiation of the deposit." *United States v. Li,* 55 F.3d 325, 330 (7th Cir.1995) (quoting *Li,* 856 F.Supp. at 423).

The *Li* holding does not stand for the proposition that, after the initial deposits are made, "latter or subsequent transactions/use of the identical monies" cannot constitute further criminal activity. "[I]t is the individual acts of money laundering which are prohibited under Section 1956(a)(1)(B)(i), and not the course of action which those individual acts may constitute." *Martin,* 933 F.2d at 611 (citing *Blockburger v. United States,* 284 U.S. 299, 302, 52 S.Ct. 180, 181, 76 L.Ed. 306 (1932)). As indicated, the expressed intent of Congress was to make each money laundering transaction a separate offense. Accordingly, later transactions may constitute money laundering under Section 1956(a)(1)(B)(i).

The Government was required to prove one Overt Act was committed after 29 May 1991. Two of the Overt Acts charged in the Second Superseding Indictment, Overt Acts One and Three, were alleged to have been committed before the 29 May 1991 cut-off date. While the Government was entitled to prove overt acts occurring outside the limitations period, *see e.g., Adamo,* 534 F.2d at 37–39, proof of Overt Acts One and Three alone could not sustain the Conspiracy charge.[12] Overt Acts Two, Four and Five, however, properly charged actions, taken in furtherance of the Conspiracy, occurring after the 29 May 1996 cut-off date.

Defendants made the confused argument Overt Acts Four and Five could not support the Conspiracy charge because they did not constitute "financial transactions" under Section 1956(c)(3) at the times relevant to the Conspiracy but later were included in the

---

**12.** Overt Act One charged Defendants made cash deposits into the McNeil NatWest Checking Account between in or about January 1991 and in or about April 1991. Second Superseding In-

dictment ¶ 1 at 8. Overt Act Three charged McNeil obtained the Hudson City Loan on or about 18 January 1990. *Id.,* ¶ 3 at 8.

definition. Dismissal Brief at 26–27. Defendants argued "[t]he 'safe deposit boxes' allegations of Overt Acts Four and Five are without operative effect, not because of their timing but because of their innocence." Dismissal Brief at 27.

The fact the use of a safe deposit box was not a proscribed "financial transaction" under Section 1956(c)(3) when Overt Acts Four and Five were performed was irrelevant. As indicated, an overt act need not be a crime and may be an innocent act if considered apart from the Conspiracy. *Braverman,* 317 U.S. at 53, 63 S.Ct. at 101; *Adamo,* 534 F.2d at 39 n. 6. Defendants' argument that Overt Acts Four and Five should have been stricken because they did not support a money laundering charge under Section 1956(a)(1)(B)(i) when they were committed was, therefore, without merit. Defendants were charged with a conspiracy to commit money laundering under Section 371.

Defendants apparently conceded this point in the Reply Brief and instead speculated Overt Acts Four and Five may have improperly been presented to the Grand Jury as financial transactions under Section 1956(a)(1)(B)(i) and, therefore, should have been struck from the Second Superseding Indictment. Reply Brief at 5. Defendants' speculations regarding the evidence submitted to the Grand Jury were insufficient to warrant the striking of Overt Acts Four and Five.

The argument that the transactions described in Overt Act Two were too far removed from Blackwell's embezzlement to be considered money laundering likewise did not justify the Dismissal of Count Two. The

Grand Jury returned the Second Superseding Indictment which charged the Conspiracy continued after 29 May 1991; the Grand Jury determination is presumed to be appropriate. *DiPasquale,* 740 F.2d at 1294. Defendants presented neither credible evidence nor a credible argument that the Conspiracy terminated before this date.

Without support, Defendants argued the probative value of the Overt Acts was outweighed by their undue prejudicial effect: "The danger of permitting such a method of proof is self-evident. The defense views this problem as within the ambit of Rules 401–402 and 403, Federal Rules of Evidence." Dismissal Brief at 9.

Pursuant to Rule 401 of the Federal Rules of Evidence ("Rule 401"), the evidence concerning the transactions described in the Overt Acts was required to be relevant to the Conspiracy charge.[13] Rule 403 of the Federal Rules of Evidence ("Rule 403") permits a trial court to exclude relevant evidence if its relevance is overshadowed by the risk of unfair prejudice, confusion of issues, misleading the jury or waste of time. *Id.; United States v. Eufrasio,* 935 F.2d 553, 571 (3d Cir.), *cert. denied,* 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991).[14]

The Government argued "[i]t should go without saying that it would take some length of time for a conspirator intending to conceal his or her crime, to launder $470,000 into 'good' spendable money.[15] Moreover, the cash deposits continued to be made into the accounts, including the McNeil First Fidelity Checking Account, at a time at which the only source of income to the [D]efendants

---

**13.** Rule 401 provides: "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* Fed.R.Evid. 402 provides: "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution ..., by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." *Id.*

**14.** Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed

by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Id.*

**15.** The Second Superseding Indictment alleged Blackwell embezzled $470,000 from NatWest from January 1989 through October 1990, when she left NatWest's employ. Second Superseding Indictment, ¶ 6 at 2. The Government alleged the cash deposits into the McNeil First Fidelity Checking Account continued until April 1992. *Id.* ¶ 2 at 8.

was the monthly disability payment collected by ... McNeil." Opposition Brief at 17.

The McNeil First Fidelity Checking Account showed numerous cash deposits, ranging from $25.00 to $1,650.00 and totaling $10,863.90, from 29 May 1991 through 5 May 1992. Summary of Activity, *passim*. Despite arguing the activity at the McNeil First Fidelity Checking Account during this period was merely indicative of normal banking activity, not money laundering, Defendants failed to explain the origin of $10,863.90 in cash deposits.

The cash deposits into the McNeil First Fidelity Checking Account appeared relevant to the Conspiracy charge. Aside from their conclusory assertions discussed above, Defendants failed to demonstrate how the probative value of the deposits was substantially outweighed by any undue prejudicial effect. Count Two, moreover, could not be properly challenged in a pretrial motion on the ground it was not supported by adequate evidence. *Knox*, 396 U.S. at 83. The argument that the transactions described above were too far removed from the embezzlement to support the Conspiracy charge was an argument for the jury during trial. At trial, counsel did not object to the introduction of evidence concerning the cash deposits into the McNeil First Fidelity Checking Account.

### B. *Defendants' Request for a Pretrial Evidentiary Hearing*

As indicated, Defendants requested a pretrial evidentiary hearing, pursuant to Rule 103(a)(1) of the Federal Rules of Evidence. Defendants argued such a hearing was necessary to determine the admissibility of evidence Defendants argued "clashe[d] with the statute of limitations on grounds of competence, relevance and prejudice." Dismissal Brief at 28.

■■■ Although Rule 12 does not by its terms specify when such a motion entitles a defendant to a pretrial evidentiary hearing, the Circuit has held that a defendant's moving papers must demonstrate a "colorable claim" for relief. *United States v. Brink*, 39 F.3d 419, 424 (3d Cir.1994) (remanding for hearing where defendant alleged facts that, if

true, "could violate a defendant's rights under the Sixth Amendment"); *see · United States v. Soberon*, 929 F.2d 935, 941 (3d Cir.) (if district court had "reasonable suspicion" of prosecutorial misconduct proper course was to hold evidentiary hearing), *cert. denied*, 502 U.S. 818, 112 S.Ct. 73, 116 L.Ed.2d 47 (1991).

■■■ In order to be "colorable," a defendant's motion must consist of more than mere allegations of misconduct. *United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir.) ("A district court does not have to hold evidentiary hearing on a motion just because a party asks for one."), *cert. denied*, 498 U.S. 843, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990). There must be issues of fact material to the resolution of the defendant's claim. *See United States v. Panitz*, 907 F.2d 1267, 1273–74 (1st Cir.1990) (refusal to hold evidentiary hearing proper because material facts were not in dispute); *Sophie*, 900 F.2d at 1071 (refusal to hold hearing proper where defendant's own submissions refuted his claim).

■■■ A pretrial evidentiary hearing was not warranted in the instant case; Defendants failed to raise a colorable claim requiring an evidentiary hearing. The Second Superseding Indictment validly charged a conspiracy in violation of Section 371 and alleged overt acts falling within the statute of limitations. The questions of whether the Conspiracy remained in existence and whether Overt Acts Two, Four and Five were in furtherance of the Conspiracy were questions for the jury. *Cannistraro*, 800 F.Supp. at 78.

### C. *Disclosure of the Grand Jury Transcripts*

Defendants moved for an order directing disclosure of grand jury transcripts, grand jury attendance and voting records. Disclosure Brief at 1. In support of this motion, Defendants asserted the Grand Jury material might have revealed that Overt Acts Four and Five were "improperly supplied to the grand jury as 'acts of wrongdoing.'" Disclosure Brief at 4. Defendants argued that because the "use of a 'safe deposit box,' at the time of the offense, was not statutorily deemed an act of money laundering .... [i]t's

(sic) presentation to the grand jury ... therefore, was ill-founded and unquestionably tainted the grands (sic) jury proceeding." *Id.* Defendants sought the disclosure of the Grand Jury transcripts for the purpose of determining whether grounds existed "for a subsequent motion to dismiss based on a 'tainted or contaminated grand jury review.'" *Id.*

■ Disclosure of grand jury material is contrary to the "'long established policy that maintains the secrecy of grand jury proceedings in the federal courts.'" *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 424, 103 S.Ct. 3133, 3138, 77 L.Ed.2d 743 (1983) (quoting *United States v. Procter & Gamble Co.,* 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958)); *In re Grand Jury Investigation,* 903 F.2d 180, 182 (3d Cir. 1990); *Giampa,* 904 F.Supp. at 287; *United States v. Eisenberg,* 773 F.Supp. 662, 707 (D.N.J.1991); *see In re Grand Jury Investigation,* 55 F.3d 350, 353–54 (8th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 307, 133 L.Ed.2d 211 (1995). The Supreme Court has observed grand jury secrecy is "older than our Nation itself." *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959). "Since the 17th century, grand jury proceedings have been closed to the public, and records of such proceedings have been kept from the public eye.... The rule of grand jury secrecy was imported into our federal common law and is an integral part of our criminal justice system." *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218 n. 9, 99 S.Ct. 1667, 1672 n. 9, 60 L.Ed.2d 156 (1979). This general rule of grand jury secrecy is now codified in Rule 6(e) of the Federal Rules of Criminal Procedure ("Rule 6(e)").[16] *Id.* Rule 6(e) applies "not only to information drawn from transcripts of grand jury proceedings, but also to anything which may reveal what occurred before the grand jury." *In re Grand Jury Matter,* 682 F.2d 61, 63 (3d Cir.1982); *see Fund for Constitu-*

*tional Gov't v. National Archives & Records Serv.,* 656 F.2d 856, 869 (D.C.Cir.1981) (scope of grand jury secrecy encompasses anything which would reveal "the identities of witnesses or jurors, the substance of the testimony, the strategy or direction of the investigation, the deliberations or question of the jurors, and the like") (quoting *SEC v. Dresser Indus., Inc.,* 628 F.2d 1368, 1382 (D.C.Cir.), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)).

The secrecy of grand jury proceedings is not absolute, however. *In re Grand Jury Investigation,* 903 F.2d at 182; *see Davies v. Commissioner of Internal Revenue,* 68 F.3d 1129, 1130 (9th Cir.1995) ("Rule 6(e) protects only materials that 'reveal some secret aspect of the inner workings of the grand jury.'") (quoting *United States v. Dynavac, Inc.,* 6 F.3d 1407, 1413 (9th Cir.1993)). Rule 6(e)(3)(C) authorizes disclosure by court order and states, in pertinent part:

> Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—(i) when so directed by the court preliminarily to or in connection with a judicial proceeding; [or] (ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury....

*Id.*

■ The party moving for court-ordered disclosure bears a heavy burden of demonstrating (1) "the material [he or she] seek[s] is needed to avoid a possible injustice in another judicial proceeding," (2) "the need for disclosure is greater than the need for continued secrecy" and (3) "[the] request is structured to cover only material so needed." *Douglas,* 441 U.S. at 222, 99 S.Ct. at 1674 (footnote omitted); *Eisenberg,* 773 F.Supp. at 707.

**16.** Rule 6(e)(2) states, in pertinent part:

A grand juror, an interpreter, a stenographer, an operator of a recording devise, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(iii) of this

subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules.... A knowing violation of Rule 6 may be punished as a contempt of court.

*Id.*

The most significant factor which a party seeking disclosure must show is a "particularized need" for the information. *United States v. Mechanik,* 475 U.S. 66, 75, 106 S.Ct. 938, 944, 89 L.Ed.2d 50 (1986) (Burger, C.J., concurring); *Sells Engineering,* 463 U.S. at 434, 103 S.Ct. at 3143; *Illinois v. Abbott & Assocs., Inc.,* 460 U.S. 557, 567, 103 S.Ct. 1356, 1361, 75 L.Ed.2d 281 (1983); *United States v. Canino,* 949 F.2d 928, 943 (7th Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992); *In re Lynde,* 922 F.2d 1448, 1452 (10th Cir.1991); *United States v. McDowell,* 888 F.2d 285, 289 (3d Cir.1989); *In re Disclosure of Grand Jury Material,* 645 F.Supp. 76, 78 (N.D.W.Va.1986); *see also Hernly v. United States,* 832 F.2d 980, 984 (7th Cir.1987) ("secrecy is not broken 'except where there is a compelling necessity' for the material") (quoting *Procter & Gamble,* 356 U.S. at 682, 78 S.Ct. at 986).

■ There is a presumption of regularity in grand jury proceedings. *United States v. R. Enterprises, Inc.,* 498 U.S. 292, 300–01, 111 S.Ct. 722, 727–28, 112 L.Ed.2d 795 (1991); *United States v. Educational Development Network Corp.,* 884 F.2d 737, 740 (3d Cir.1989), *cert. denied,* 494 U.S. 1078, 110 S.Ct. 1806, 108 L.Ed.2d 937 (1990); *United States v. Chimurenga,* 609 F.Supp. 1070, 1075 (S.D.N.Y.1985), *aff'd sub ·nom., United States v. Pean,* 800 F.2d 1129 (2d Cir.1986). To obtain information about the conduct of grand jury proceedings, a party must offer evidence of a "substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury." *United States v. Budzanoski,* 462 F.2d 443, 454 (3d Cir.1972), *cert. denied,* 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972); *Eisenberg,* 773 F.Supp. at 707; *United States v. Dioguardi,* 332 F.Supp. 7, 20 (S.D.N.Y.1971).

■ Conclusory or speculative allegations about what went wrong in a grand jury proceeding give no cause to question the regularity of the grand jury's functioning. *Budzanoski,* 462 F.2d at 454; *Giampa,* 904 F.Supp. at 288; *United States v. Zuluaga,* 651 F.Supp. 746, 748 (E.D.N.Y.1986); *United States v. Gordon,* 493 F.Supp. 814, 817 (N.D.N.Y.1980), *aff'd,* 655 F.2d 478 (2d Cir.

1981). Nor do such allegations outweigh the need for secrecy. *Zuluaga,* 651 F.Supp. at 748; *·United States v. Beatty,* 587 F.Supp. 1325, 1334–35 (E.D.N.Y.1984).

■ In considering the effects of disclosure upon grand jury proceedings, the Supreme Court has stated:

[C]ourts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries.... Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties.

*Douglas Oil,* 441 U.S. at 222, 99 S.Ct. at 1674; *accord Hernly,* 832 F.2d at 984; *Grand Jury Material,* 645 F.Supp. at 78; *In re Grocery Products Grand Jury Proceedings of 1983,* 637 F.Supp. 1171, 1174 (D.Conn. 1986); *see also In re Petition of Tribune Co.,* 784 F.2d 1518, 1522 (11th Cir.1986) ("courts retain an obligation ... to preserve the secrecy of grand jury proceedings and the privacy of jurors"). Even after a grand jury has completed its investigation, a court is not relieved of its obligation to apply the rationale set forth in *Douglas Oil. Lynde,* 922 F.2d at 1454; *Shell v. Wall,* 760 F.Supp. 545, 547 (W.D.N.C.1991); *In re Grand Jury Proceedings (Daewoo),* 613 F.Supp. 672, 679 (D.Or.1985). As the Court stated in *Lynde:*

[A]s the reasons for protecting grand jury proceedings become less significant the burden of showing justification lessens accordingly. However, when the relevant grand jury proceedings have been concluded, as in the present case, "the interests in grand jury secrecy, although reduced, are not eliminated." There must still be a sufficient showing of the factors announced in *Douglas Oil....*

922 F.2d at 1454 (quoting *Douglas Oil,* 441 U.S. at 222, 99 S.Ct. at 1674); *accord Hernly,* 832 F.2d at 984; *Shell,* 760 F.Supp. at 547. Moreover, "one's right to disclosure may not ... rest simply upon the weakness of the public interest considerations in favor of secrecy; there must be some real showing of need on the part of the moving party." *In re Grand Jury Proceedings,* 800 F.2d 1293,

1300, 1302 (4th Cir.1986); *Shell,* 760 F.Supp. at 548.

■ In the instant case, Defendants offered no evidence or compelling argument to justify the disclosure of grand jury material. Defendants merely speculated the Government improperly presented Overt Acts Four and Five as substantive money laundering offenses. As indicated, "mere speculation" that evidence was improperly presented is insufficient to warrant disclosure of the information sought. Defendants, therefore, failed to show a particularized need for the grand jury material.

### D. *Disclosure of Brady Material*

Defendants sought "information and evidence including ... promises of leniency and remunerative arrangements made to procure testimony from any witnesses, evidence that tends to show prejudice by any witness, evidence which would tend to impeach the credibility of any witness and any evidence that falls within the purview of *Brady.*" Omnibus Brief at 4. Defendants specifically sought:

(a) Any information, in any form whatsoever, the existence of which is known, or by the exercise of due diligence may become known, to the government bearing upon the credibility of any person who the government intends to call at trial, including but not limited to any prior criminal arrest or conviction, any pending criminal indictment or information, any pending criminal or civil investigation related to any activity of such person;

(b) any all (sic) evidence having to do with criminal conduct—local, state or Federal—on the part of any person whom the prosecution intends to call as a witness at trial, or which the prosecution, its agents and representatives have become aware;

(c) any and all promises, understandings or agreements, formal or informal, between the prosecution, its agents and representatives and persons (including counsel for such persons) whom the government intends to call as witnesses at trial, together with copies of any and all documentation pertaining thereto. This request includes but is not limited to such promises, understandings or agreements as may have been

made in connection with other cases or investigations;

(d) any and all actions, promises, efforts or inducements—formal or informal—on the part of the government, its agents and representatives to aid, assist or obtain benefits of any kind, at any time for person (sic) whom the government considers a potential witness at trial.

Omnibus Brief at 5. Defendants also requested the Government "be required to retain any contemporaneous rough notes taken by a [G]overnment agent of briefings, conversation, or interviews during [the] ... investigation of the instant case." *Id.* at 6.

■ *Brady* held the Government's failure to disclose evidence favorable to a defendant who specifically requested it violated the right of the accused to Due Process when the evidence was material to either guilt or punishment, "irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1197. Under *Brady,* materials must be disclosed if they "go to the heart of the defendant's guilt or innocence [or] might affect the jury's judgment of the credibility of a crucial prosecution witness." *United States v. Hill,* 976 F.2d 132, 134–35 (3d Cir.1992) (citing *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)). In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court modified the *Brady* rule to require the Government to disclose exculpatory evidence even when the defendant has not requested the information. *Id.* at 107, 96 S.Ct. at 2399; *see Giampa,* 904 F.Supp. at 280 n. 33 (citing *United States v. Perdomo,* 929 F.2d 967, 970 (3d Cir.1991)). In *Giglio,* the Supreme Court held the *Brady* rule includes information that could be used to impeach the credibility of Government witnesses when the reliability of the witness could help determine the guilt or innocence of the accused. 405 U.S. at 154, 92 S.Ct. at 766; *see United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *United States v. Starusko,* 729 F.2d 256, 260 (3d Cir.1984); *United States v. Higgs,* 713 F.2d 39, 42 (3d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984).

*Brady* material must ordinarily be disclosed "in time for its effective use at trial." *Higgs,* 713 F.2d at 44. "A district court has general discretionary authority to order the pretrial disclosure of *Brady* material 'to ensure the effective administration of the criminal justice system.'" *Giampa,* 904 F.Supp. at 281 (quoting *Government of Virgin Islands v. Martinez,* 847 F.2d 125, 127 (3d Cir.1988)); *see Starusko,* 729 F.2d at 261; *Higgs,* 713 F.2d at 42. The Circuit has indicated district courts should encourage early production of *Brady* material. *Starusko,* 729 F.2d at 261 (citing *United States ex rel. Marzeno v. Gengler,* 574 F.2d 730, 739 (3d Cir.1978); *United States v. Kaplan,* 554 F.2d 577, 578 (3d Cir.1977); *Giampa,* 904 F.Supp. at 281.

The Government asserted it was aware of its obligation to disclose all *Brady* material and had already done so. Omnibus Opposition Brief at 5–6. The Government also asserted that it would "continue to comply with its *Brady* obligations should any exculpatory material come into its possession." *Id.* Accordingly, Defendants' *Brady* motion was denied as moot.

### E. *Disclosure of Rule 404(b) Material*

Defendants moved for an order compelling the Government to provide pre-trial disclosure of any Rule 404(b) evidence it intended to introduce at trial. Omnibus Brief at 7. Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan knowledge, identity, or absence of mistake or accident, *provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial,* or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

*Id.* (emphasis added).

The purpose of the pre-trial notice requirement of Rule 404(b) is "'to re-duce surprise and promote early resolution on the issue of admissibility.'" *United States v. Williams,* 792 F.Supp. 1120, 1133 (S.D.Ind.1992) (quoting Rule 404(b), Notes of Committee on the Judiciary, Senate Report No. 93–1277 U.S.Code Cong. & Admin.News 1974, p. 7051); *see Giampa,* 904 F.Supp. at 283 (same). The determination of "what constitutes a reasonable request or disclosure will depend largely on the circumstances." *Williams,* 792 F.Supp. at 1133 (creating general ten-day rule) (quoting Rule 404(b), Notes of Committee on the Judiciary, Senate Report No. 93–1277); *cf. United States v. Kern,* 12 F.3d 122, 124 (8th Cir.1993) (notice fourteen days prior to trial is sufficient under Rule 404(b)); *Giampa,* 904 F.Supp. at 283 (ordering notice two weeks before trial); *United States v. Evangelista,* 813 F.Supp. 294, 302 (D.N.J.1993) (notice ten business days prior to trial is sufficient under Rule 404(b)); *United States v. Alex,* 791 F.Supp. 723, 729 (N.D.Ill.1992) (ordering notice seven days before trial); *Eisenberg,* 773 F.Supp. at 687.

The Government pledged to provide notice of "any Rule 404(b) evidence it intended to introduce at trial at least three days before trial." Omnibus Opposition Brief at 10. This notice appeared adequate under the facts of the instant case; no objection was offered by Defendants. Defendants' Rule 404(b) motion was therefore denied as moot.

As indicated, Defendants sought pretrial disclosure of Rule 404(b) evidence so the court may make an *in limine* ruling on admissibility. Generally, objections as to the admissibility of prior bad acts under Rule 404(b) are properly asserted during trial, not at the pretrial stage. *Luce v. United States,* 469 U.S. 38, 41, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984); *Eisenberg,* 773 F.Supp. at 685; *see also United States v. Vastola,* 670 F.Supp. 1244, 1268 (D.N.J.1987) (it would be "unduly speculative" to rule on the admissibility of "other acts" evidence before hearing the factual context at trial); *United States v. Ramirez,* 602 F.Supp. 783, 794 (S.D.N.Y. 1985) (defendant's request for pretrial hearing to determine admissibility of alleged prior or subsequent similar act denied; defen-

dant instructed to seek ruling during course of trial). Defendants' objections to any Rule 404(b) evidence the Government sought to introduce could properly be dealt with during the course of the trial; addressing Defendants' objections prior to trial was unnecessary. At trial, no Rule 404(b) objections were made.

### F. *Disclosure of Jencks Act Material*

Defendants moved for an order requiring the Government "to turn over its 'Jencks Act' material seven days prior to trial." Omnibus Brief at 10. Defendants also asked that the Government be compelled "to preserve and retain three categories of documents: (1) contemporaneous rough notes taken by a government agent of meetings, conversations or interviews during the course of her or her (sic) investigations; (2) the agents (sic) subsequently prepared drafts of her reports of these incidents and (3) the final report signed by the agent." *Id.*

■ Under the Jencks Act and Rule 26.2, which incorporates the substance of the Jencks Act, a Federal criminal defendant may request pretrial statements of a Government witness which relate to the testimony of that witness following the completion of direct examination:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness (other than the defendant) shall be the subject of subpena (sic), discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500(a) ("Section 3500(a)"); *see Palermo v. United States*, 360 U.S. 343, 349, 79 S.Ct. 1217, 1223, 3 L.Ed.2d 1287 (1959) (noting the purpose of Section 3500(a) is to restrict the use of these statements by witnesses to impeachment).

The Jencks Act further provides:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the [Government] to produce any statement ... of the witness in the possession of the [Government] which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b). "Statements" include statements written or adopted by a witness and "stenographic, mechanical, electrical, or other recording[s] or a transcription thereof, which is a substantially verbatim recital of an oral statement" made by a witness. Statements by a witness to a grand jury are also included in this definition. 18 U.S.C. § 3500(e).

■ "Statements" should be strictly construed. *Palermo*, 360 U.S. at 350, 79 S.Ct. at 1223–24 (holding defense cannot compel disclosure of memoranda containing a Government agent's interpretation of a witness' statements, because such statements are not "the witness' own [but] rather ... the product of the investigator's selections, interpretations and interpolations."). When considering whether something qualifies as a "statement" under the Jencks Act, the court must consider whether "the statement could fairly be deemed to reflect fully and without distortion what had been said to the [G]overnment agent.... Summaries of an oral statement which evidence substantial selection of material, or were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions." *Id.* at 352–53, 79 S.Ct. at 1224–25.

■ Once a defendant establishes the Jencks Act entitles him or her to a statement, he or she need not show any impeachment value or inconsistency with statements made by a witness at trial to require the Government to produce it. *United States v. Brumel–Alvarez*, 991 F.2d 1452, 1464 (9th Cir.1992) ("The prosecution is obligated to disclose to the defense statements falling within the Jencks Act regardless of anyone's perception of the utility of the statements for impeachment.") (citations and internal quotations omitted).

■ The Jencks Act required the Government to divulge to Defendants statements by witnesses, other than those of Defendants, only after such witnesses testify at

trial. 18 U.S.C. § 3500(a). Although the court cannot compel disclosure of Jencks material prior to the conclusion of direct examination of the Government's witness, the Circuit encourages early disclosure to obviate trial interruptions. *Hill,* 976 F.2d at 140 (citing *United States v. Murphy,* 569 F.2d 771, 773 n. 3 (3d Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978)). In the instant case, the Government agreed to disclose all Jencks material no later than the day before the applicable witness testifies at trial. Opposition Brief at 68–69. Accordingly, Defendants' motion seeking early disclosure of Jencks Act material was denied.

## G. *Rule 801(d)(2)(E)*

Defendants moved for a pre-trial hearing pursuant to Rule 801(d)(2)(E) to determine the admissibility of co-conspirator statements. Omnibus Brief at 17; *see United States v. James,* 576 F.2d 1121, 1127–32 (5th Cir.1978), *modified,* 590 F.2d 575 (5th Cir.) (*en banc* ), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

■ Rule 801(d)(2)(E) provides that a statement is not hearsay if it is "offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." *Id.* In order for statements to be admissible under this exception, it must appear (1) that a conspiracy existed, (2) the declarant and the party against whom the statement is offered were members of the conspiracy, (3) the statement was made in the course of the conspiracy and (4) the statement was made in furtherance of the conspiracy. *Id.; Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987); *see McGlory,* 968 F.2d at 333; *United States v. Gambino,* 926 F.2d 1355, 1360 (3d Cir.), *cert. denied,* 501 U.S. 1206, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991); *Virgin Islands v. Brathwaite,* 782 F.2d 399, 403 (3d Cir.1986); *United States v. Gibbs,* 739 F.2d 838, 843 (3d Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985); *United States v. Trotter,* 529 F.2d 806, 812 (3d Cir. 1976); *Giampa,* 904 F.Supp. at 284 n. 42;

*United States v. Bissell,* 954 F.Supp. 841, 888 (D.N.J.1996).

■ A court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted; "'the judge should receive the evidence and give it such weight as his [or her] judgment and experience counsel.'" *Bourjaily,* 483 U.S. at 181, 107 S.Ct. at 2781 (quoting *United States v. Matlock,* 415 U.S. 164, 175, 94 S.Ct. 988, 995, 39 L.Ed.2d 242 (1974)).

■ A pre-trial hearing to determine the admissibility of statements by a co-conspirator is not mandated; the admissibility of such statements may be properly dealt with at trial. *See Gambino,* 926 F.2d at 1360–61 (upholding admission of co-conspirator testimony subject to later connection); *United States v. De Peri,* 778 F.2d 963, 981 (3d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *United States v. Ammar,* 714 F.2d 238, 246 (3d Cir.), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Continental Group, Inc.,* 603 F.2d 444, 456 (3d Cir.1979); *Giampa,* 904 F.Supp. at 286; *United States v. Zolp,* 659 F.Supp. 692, 709 (D.N.J.1987).

■ A pre-trial hearing in the instant case was not warranted. While it appeared the Government intended to introduce "several statements" pursuant to Rule 801(d)(2)(E), *see* letter of AUSA John M. Fietkiewicz to the court, dated 20 May 1996, the admissibility of such statements could readily be determined at trial; a pre-trial hearing was, therefore, unnecessary. No objections were made at trial.

## H. *Reciprocal Discovery*

■ There was no dispute concerning the validity of this motion. Courts have not hesitated to order pretrial discovery in favor of the Government where the Government has complied with the defendant's discovery requests. *See Bissell,* 954 F.Supp. at 871; *Giampa,* 904 F.Supp. at 291; *United States v. Parlavecchio,* 903 F.Supp. 788, 796 (D.N.J. 1995) (defendants' failure to challenge Government's motion gives rise to assumption

they do not object to reciprocal discovery); *United States v. Kraselnick*, 702 F.Supp. 480, 487 (D.N.J.1988) (once the Government is determined to have complied with defendant's discovery requests, "the [G]overnment may request discovery and defendant[ ] will be obliged to comply or face possible sanction by the court.").

In the instant case, the Government made discovery available to Defendants, Omnibus Opposition Brief at 16; it was, therefore, appropriate to order reciprocal discovery. *Giampa*, 904 F.Supp. at 291 (citing *United States v. Stackpole*, 811 F.2d 689, 697 (1st Cir.1987)). Defendants offered no objection to the Government's request for reciprocal discovery. Accordingly, Defendants were directed to provide the Government with pretrial discovery.

## I. *Use of Demonstrative Charts and Summary Witnesses*

As indicated, prior to trial, the Government sought an order allowing the introduction of summary charts as demonstrative evidence (the "Demonstrative Charts"). The Government sought permission to use the Demonstrative Charts at trial, to organize and summarize the Government's evidence. The Government also moved for leave to use a summary witness to "summarize some of the evidence presented in the case, lay the foundation for the Government's charts, and explain the charts." Demonstrative Charts and Summary Witnesses Brief at 2. Defendants argued, before trial, the Government should not be permitted to introduce the Demonstrative Charts and/or call summary witnesses at trial because the instant case was not "so complex that the triers of fact need 'summaries' and . . . to approve the use of charts and/or summary witnesses will unfairly grant the prosecution of 'mid-trial summations,' which would violate Rule 403 . . . [and] infringe upon the accused's right to a fair trial." Blackwell Opposition Letter at 2.

### 1. *Demonstrative Charts*

██ Compilations or charts which are used only to summarize or organize testimony or documents which have themselves been admitted into evidence are distinguished from those used as evidence pursuant to Rule 1006 of the Federal Rules of Evidence ("Rule 1006"). Charts that summarize documents or testimony, already admitted into evidence, may be admissible under Rule 611(a) ("Rule 611(a)") of the Federal Rules of Evidence, as demonstrative evidence, as opposed to Rule 1006, as substantive evidence. *See United States v. Paulino*, 935 F.2d 739, 753 (6th Cir.), *cert. denied*, 502 U.S. 914, 112 S.Ct. 315, 116 L.Ed.2d 257 (1991) (organizational chart of conspirator's roles in drug conspiracy and chart summarizing income from cocaine sales admissible under Rule 611(a)); *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir.), *cert. denied*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988) (The trial judge did not abuse his discretion in determining summary charts would be helpful to the jury and not cumulative; the judge reminded the jury of "their responsibility to determine whether the charts accurately reflected the evidence presented."); *United States v. Possick*, 849 F.2d 332, 339 (8th Cir.1988) (use of demonstrative charts "to aid the jury's comprehension is well within the court's discretion"); *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir.1980) (chart in tax evasion case summarizing assets, liabilities and expenditures admissible under Rule 611(a) because it contributed to clarity of presentation to jury and was reasonable method of presenting evidence); *United State v. Scales*, 594 F.2d 558, 561–63 (6th Cir.) (chart summarizing charges in indictment and some of the documents in evidence admissible under Rule 611(a)), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979); *United States v. Bertoli*, 854 F.Supp. 975, 1052–53 (D.N.J.), *aff'd in part, sentence vacated in part*, 40 F.3d 1384 (1994).

Rule 611(a) provides

[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

*Id.*

██ As discussed in the Advisory Committee Note to Rule 611, the rule covers such

matters as the presentation of evidence, "the use of demonstrative evidence ... and the many other questions arising during the course of a trial which can be solved only by the judge's common sense and fairness in view of the particular circumstances." Fed. R.Evid. 611 Advisory Committee Note. The use of demonstrative charts to "aid the jury's comprehension is well within the court's discretion." *Possick*, 849 F.2d at 339; *Paulino*, 935 F.2d at 753; *Gardner*, 611 F.2d at 776; *Bertoli*, 854 F.Supp. at 1053. When Rule 611 charts are used, however, it is required the charts be accompanied by an instruction from the court which "informs the jury of the summary's purpose and that it does not constitute evidence." *Paulino*, 935 F.2d at 753; *see Holland v. United States*, 348 U.S. 121, 128, 75 S.Ct. 127, 131–32, 99 L.Ed. 150 (1954); *Scales*, 594 F.2d at 561–62; *Bertoli*, 854 F.Supp. at 1053.

In the instant case, the Demonstrative Charts were introduced at trial by Diane Appel ("Appel"). Trial Tr. at 831. Appel is a financial analyst for the Federal Bureau of Investigation. *Id.* at 823. The Demonstrative Charts summarized (1) the missing Eastern Music deposits, (2) the "deposit ticket receipts from Eastern Music that went along with the missing deposits," (3) the deposits into the Blackwell NatWest Checking Account, (4) payments of legal fees to Marrazzo & Associates, (5) deposits into and withdrawals from the McNeil NatWest and First Fidelity Checking Accounts and the McNeil Hudson City Savings Account, (6) principal payments on the Hudson City Loan, (7) checks from the McNeil NatWest and First Fidelity Checking Accounts that were cashed at Hudson City, (8) casino records relating to Blackwell, (9) casino records relating to McNeil, (10) deposits into the Blackwell Natwest Checking Account, and (11) information contained in the above-described charts. *Id.* at 825–44.

The evidence in the instant case was sufficiently voluminous and complicated to justify the use of summary charts. Documents relating to numerous financial transactions were entered in evidence. Defendants' conclusory argument, prior to trial, that the use of the Demonstrative Charts would violate Rule 403, *see* Blackwell Opposition Letter at 4, was without merit.

At trial, defense counsel made no new objections to the introduction of the Demonstrative Charts. Trial Tr. at 831–44. Counsel for Blackwell, moreover, sought, and was given permission, to use several of the Demonstrative Charts before they were introduced in evidence by the Government. Trial Tr. at 430–31. As indicated, the potential that demonstrative charts, such as the ones at issue, may be misconstrued by the jury may be cured by an appropriate jury instruction.

At trial, the following instruction was given: [17]

The Government has ... presented exhibits in the form of charts. I'll characterize these as demonstrative charts. These demonstrative charts were shown to you in order to make the other evidence more meaningful and to aid you in considering the evidence.

The information on each of these demonstrative charts is based upon other exhibits in evidence in the case and upon testimony presented during the course of the trial. The sources of the information for these demonstrative charts are noted on each chart. If you want to see the underlying exhibits, please ask, they'll be provided to you.

These demonstrative charts are not better than the testimony and documents upon which they are based. They are not themselves independent evidence. Therefore, you are to give no greater consideration to these demonstrative charts than you would give to the evidence upon which they are based. It is for you to decide whether the demonstrative charts correctly present the data and information contained in the testimony and the exhibits upon which they are based.

You are entitled to consider the demonstrative charts if you find they are of assistance to you in analyzing and understanding the evidence.

---

17. Defense counsel offered no objections to the jury charge regarding the Demonstrative Charts.

Trial Tr. at 1299. The introduction of the Demonstrative Charts was appropriate and did not prejudice the defense.

### 2. *Summary Witnesses*

 Summary Witnesses are allowed in appropriate cases "to aid the jury in its examination of the evidence already admitted." *Scales,* 594 F.2d at 563; *United States v. Winn,* 948 F.2d 145, 158 (5th Cir.1991), *cert. denied,* 503 U.S. 976, 112 S.Ct. 1599, 118 L.Ed.2d 313 (1992). Summary witnesses are appropriate in complicated cases:

> [J]ust as an expert can assist a jury by imparting special knowledge that helps the jury to understand technical evidence, a non-expert summary witness can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses throughout trial.

*United States v. Lemire,* 720 F.2d 1327, 1347 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984).

 In a case that involves the consideration of numerous records, summary witnesses may testify at trial to summarize the testimony of other witnesses and the documents or charts admitted into evidence. *United States v. Osum,* 943 F.2d 1394, 1405 (5th Cir.1991); *United States v. Lavergne,* 805 F.2d 517, 521 (5th Cir.1986); *Lemire,* 720 F.2d at 1347; *United States v. Caswell,* 825 F.2d 1228, 1235 (8th Cir.1987); *United States v. Evans,* 572 F.2d 455, 491–92 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).

 Defendants conclusorily argued, before trial, the use of summary witnesses was (1) not necessary, and (2) would unfairly grant the Government " 'mid-trial summations.' " Blackwell Opposition Letter at 4. No objections to the Government's summary witness were made at trial.

As indicated, the instant case involved numerous financial transactions; the use of a summary witness to assist the jury in its understanding of the evidence was appropriate. Appel was the Government's summary witness. Trial Tr. at 823. Appel was used by the Government to introduce and explain

the Demonstrative Charts to the jury. *Id.* at 824–44. Appel was also used by the Government to help explain the numerous financial transactions at issue in the case. *Id.*

Appel testified she played no part in the investigation of Defendants and that her only role was to review documents and place the information from the documents on the Demonstrative Charts. Trial Tr. at 824. She also testified she had been present throughout the course of the trial and had listened to the testimony of the witnesses. *Id.* at 825. Significantly, at trial, defense counsel neither objected to Appel's testimony nor requested a limiting instruction.

### J. *Audit of the National Westminster Bank*

The Government moved to introduce an audit (the "Audit") prepared by the Financial Audit Department of NatWest, pursuant to Rule 803(6).

Rule 803(6) provides:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, [is not excluded by the hearsay rule if it was] made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

*Id.*

 The business records exception permits admission of documents containing hearsay provided foundation testimony is provided by "the custodian or other qualified witness," that (1) the declarant in the records had personal knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions that were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were regularly kept by the

business. *United States v. Pelullo*, 964 F.2d 193, 202 (3d Cir.1992); *United States v. Furst*, 886 F.2d 558, 571 (3d Cir.1989), *cert. denied*, 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990).

 Financial audits, such as the one at issue, may properly be admitted in evidence. *See United States v. Frazier*, 53 F.3d 1105, 1110 (10th Cir.1995); *United States v. Leo*, 941 F.2d 181, 194 (3d Cir.1991) (economic data uncovered in audit admissible as a business record).

In *Frazier*, the defendant argued a "regulatory compliance audit," prepared by an accounting firm for the Department of Labor (the "DOL") and introduced by the Government at trial, was improper hearsay and should not have been admitted. 53 F.3d at 1109. The Government responded the audit was a business record and was, therefore, admissible under Rule 803(6). *Id.* at 1109. The Circuit agreed:

> The record reflects the audit report was made in the course of [the accounting firm's] regular business activity and that it was the regular practice of [the accounting firm] to create such a report. [The accounting firm] had been under contract with the DOL for ten years to perform regulatory compliance audits and had twice audited the UTSC. [The accounting firm] regularly prepared audit reports. Our review of the record convinces us that the audit report qualifies in all respects as a business record.

*Frazier*, 53 F.3d at 1110.

 Counsel for Blackwell conceded the Audit fell within the scope of Rule 803(6). *See* Blackwell Opposition at 6 ("Defendant Blackwell concurs that the [Audit] properly falls within the Ambit of Rule 803(6) and accordingly withholds any objection. . . .").[18] Prior to trial, however, counsel for Blackwell indicated potential problems with "relevance, prejudice and hearsay within hearsay under Rules 402, 403 and 805, Federal Rules of Evidence." Blackwell Opposition at 6 (reserving objections on these grounds until trial). At trial, counsel for Blackwell object-ed to the admission of the audit on the ground that it was an "investigative report" and did not, therefore, "meet the requirements of Rule 803(6) foundation." Trial Tr. at 124.

At trial, the Audit was introduced by Judith McHale ("McHale"), a vice-president of Fleet Bank.[19] Trial Tr. at 243. McHale was formerly the vice-president of the Financial Audit Department of NatWest (the "Financial Audit Department"). *Id.* at 244. The Financial Audit Department "conducted routine audits of [NatWest] branches and departments." *Id.* McHale testified that when it was determined there was a violation of bank policy, an investigation would routinely be undertaken by the Financial Audit Department who would prepare a written report. *Id.* at 245. McHale testified these written reports, including the Audit, were prepared in the ordinary course of NatWest's business and it was in the ordinary course of NatWest's business to prepare and maintain such written reports. *Id.* at 247–52.

McHale testified she supervised the special investigation (the "Special Investigation") that resulted in the Audit and that she supervised the preparation of the Audit itself. *Id.* at 246–47. She testified the audit was prepared by a NatWest employee who participated in the Special Investigation. *Id.* McHale further testified all of the documents relating to the Audit were "either prepared by someone with knowledge of the events in the documents or communicated to someone by someone with knowledge of the events." *Id.* at 252.

McHale's testimony established a proper foundation for the admission of the Audit as a business record pursuant to Rule 803(6). Blackwell's objection, at trial, to the admission of the Audit because it was "investigative report," Trial Tr. at 124, was unpersuasive. *See Leo*, 941 F.2d at 192–94 (economic data uncovered in internal investigation of company's purchasing files, initiated after Government audit uncovered discrepancies, admissible as a business record). As indicated, the foundation for the admission of the

---

**18.** McNeil did not offer any opposition to the introduction of the Audit.

**19.** Fleet Bank purchased NatWest on 1 May 1996. Trial Tr. at 243.

Audit as a business record was properly established.

### K. *Judicial Notice*

Prior to trial, the Government submitted the Judicial Notice Brief. The Judicial Notice Brief was submitted in support of the Government's anticipated request, pursuant to Rule 201(b) of the Federal Rules of Evidence,[20] that judicial notice be taken of certain facts relating to the instant case. The Government submitted eight judicial notice requests (the "Judicial Notice Requests").

The Judicial Notice Motion became moot. At trial, the Government did not request that judicial notice be taken of the facts set forth in its first Judicial Notice Request. The parties stipulated to the facts set forth in the remaining Judicial Notice Requests. Trial Tr. at 812–815.

### L. *Pre–Marked Exhibit Nos. 96a–1 and 147a*

Prior to trial, the Government moved, pursuant to Rule 803(6), for leave to introduce, at trial (1) pre-marked exhibit number 147a ("Exhibit 147a"), a redacted Report of Apparent Crime (Short Form) prepared by Hudson City Savings Bank, and (2) pre-marked exhibit number 96a–1, a Currency Transaction Report by Casinos, Form 8362, prepared by Merv Griffin's Resorts Casino Hotel. Pre–Marked Exhibit Brief at 1.

Prior to trial, counsel for McNeil conceded the exhibits were admissible, pursuant to Rule 803(6), but argued they "were highly prejudicial and therefore inadmissible under Rule 403 ... and irrelevant under Rule 401...." Neil Opposition at 1. McNeil particularly objected to Exhibit 147a. *Id.*

The Pre–Marked Exhibit Motion became moot. At trial, Exhibit 96a–1 was introduced without objection. Trial Tr. at 717. Counsel for McNeil, moreover, indicated he had "no

objection to the [redacted] copy" of Exhibit 147a. *Id.* at 606.

### M. *The Blackwell Sentencing* [21]

On 18 September 1996, the Defendants were found guilty of the counts charged in the Second Superseding Indictment. As indicated, the Department of Probation subsequently prepared the Presentence Investigation Report setting forth its calculation of Blackwell's sentence under the United States Sentencing Guidelines (the "Guidelines"). As indicated, the Sentencing Hearing was conducted on 5 December 1996.[22]

At the Sentencing Hearing, the parties were given the opportunity to present objections to the Presentence Investigation Report. Blackwell did not object to the sentencing calculations contained in the Presentence Investigation Report. Sentencing Hearing Tr. at 2. The Government offered two objections. First, the Government argued for a "two-point perjury enhancement based upon ... Blackwell's testimony at trial." *Id.* Second, the Government argued for a "two-point enhancement for abuse of trust." *Id.*

The Government argued Blackwell should be sentenced based upon a total offense level of 28, rather than the offense level of 24, calculated by the Department of Probation. Sentencing Hearing Transcript at 2. Blackwell's sentence range under the United States Sentencing Guidelines (the "Guidelines"), as calculated by the Government, would accordingly have been 78–94 months rather than 51–63 months, as calculated by the Department of Probation. Presentence Investigation Report, ¶ 79.

#### 1. *Abuse of Trust*

■ The Guidelines provide for an increase of two-levels if a defendant is convict-

---

**20.** Rule 201(b) provides a court may take notice of a fact that is

> not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

*Id.*

**21.** Following Defendants' convictions and prior to sentencing, McNeil passed away. Accordingly, the Sentencing Hearing only addressed the sentencing of Blackwell.

**22.** The transcript of the Sentencing Hearing is cited as: Sentencing Hearing Tr. at [page].

ed of abusing a position of "public or private trust." U.S.S.G. § 3B1.3 ("Section 3B1.3").[23] In order for the two-level enhancement to be applied, the defendant must be found (1) to have been in a position of trust, and (2) to have abused the position of trust in a manner that significantly facilitated the crime. *United States v. Sokolow*, 91 F.3d 396, 412 (3d Cir.1996); *United States v. Boggi*, 74 F.3d 470, 478 (3d Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 82, 136 L.Ed.2d 40 (1996); *United States v. Coyle*, 63 F.3d 1239, 1250 (3d Cir. 1995). The Commentary to Section 3B1.3 provides:

> For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.* by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, would apply in the case of an embezzlement of client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment would not apply in the case of an embezzlement or theft by an *ordinary bank teller* or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 comment. (n. 1.) (emphasis added).

■ In determining whether a position constitutes a position of trust for the purposes of Section 3B1.3, a court must consider:

(1) whether the position allows the defendant to commit a difficult to detect wrong;

(2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position.

*Sokolow*, 91 F.3d at 413 (citing *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir.1994)).

The Circuit has recognized " 'the primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong.' " *United States v. Lieberman*, 971 F.2d 989, 993 (3d Cir.1992) (quoting *United States v. Hill*, 915 F.2d 502, 506 (9th Cir.1990)); *see Pardo*, 25 F.3d at 1191 (quoting same).

■ Blackwell's position at NatWest did not enable her to commit any "difficult to detect" crimes. In fact, as demonstrated by the evidence introduced at trial, Blackwell's crimes were easily detectible. The fact that NatWest's internal auditing procedures were deficient and delayed the inevitable discovery of Blackwell's crimes does not mean Blackwell was in a position of trust. *Pardo*, 25 F.3d at 1192. The evidence demonstrated she was not. For example, Blackwell was precluded from accepting further cash deposits, beginning in July of 1990, because her supervisor found a Eastern Music cash deposit lying on Blackwell's desk. Trial Tr. at 951–52.

Blackwell was also repeatedly questioned regarding the status of the Eastern Music's account and the questionable transactions she performed attempting to cover-up the Embezzlement. This demonstrated Blackwell was not in a position of trust, within the meaning of Section 3B1.3. The evidence at trial demonstrated Blackwell's position at NatWest was akin to that of a bank teller, which, as indicated, is not a position of trust within the meaning Section 3B1.3. Accordingly, the Government's argument for a two-level enhancement, pursuant to Section 3B1.3, was rejected.

2. *Obstruction of Justice*

■ To enhance a sentence for perjury pursuant to U.S.S.G. § 3C1.1 ("Section

---

**23.** U.S.S.G. § 3B1.3 provides:
If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)....
*Id.*

3C1.1"),[24] a court must review the record and find by a preponderance of the evidence that each of the elements of perjury, willfulness, falsity, and materiality, is present. An enhancement, pursuant to Section 3C1.1, is not appropriate merely because a defendant testified at trial and was found guilty. A court must make affirmative findings with respect to each element of perjury, its conclusion is "independent" of the jury verdict. *Id.*

In *United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), the Supreme Court held that enhancement of a guidelines sentence for obstruction of justice under U.S.S.G. § 3C1.1, based upon a finding that the defendant perjured himself or herself did not violate the Constitution. The Court wrote:

> [T]he enhancement provision is part of a sentencing scheme designed to determine the appropriate type and extent of punishment after the issue of guilt has been resolved. The commission of perjury is of obvious relevance in this regard, because it reflects on a defendant's criminal history, on [his or] her willingness to accept the commands of the law and the authority of the court, and on [his or] her character in general.

*Id.* at 94, 113 S.Ct. at 1116.

■ Blackwell's testimony at trial involved significantly more than a mere denial of guilt. Blackwell willfully gave false testimony concerning material matters. At the Sentencing Hearing the following findings were made:

> [W]ith regard to the ... application of two additional points for obstruction of justice, ... this is one of the clearest examples of obstruction of justice I have sat on during the course of being a federal judge.... It was not the result of confusion, mistake or faulty memory. It was a concerted effort and design to interfere

with these judicial proceedings. Her statements were utter falsehoods, willfully, intentionally made to mislead, misdirect the jury.

> [Blackwell] submitted perjured testimony on a series of incidents, including the safe deposit box, its use, its closure in connection with the evidence with regard to the transfers of money to the Eastern Music cash collateral account; third, with regard to the denominations of the bills that were used to pay down the loans that came in, the denominations in particular she lied about; she suggested that Eastern Music brought in mainly one dollar bills.... This was all meant, designed, intended to mislead, to obstruct what went on during the course of this trial.

Sentencing Hearing Tr. at 8–9.

As indicated, an enhancement is not appropriate for a mere denial of guilt or a mere assertion of innocence. That did not happen in the instant case. It was clear from the observation of her demeanor and comportment during her testimony that Blackwell was lying. As indicated, Blackwell gave false testimony concerning several material matters; she did so with willful intent to provide false testimony, to mislead and to obstruct justice. *See Dunnigan,* 507 U.S. at 95, 113 S.Ct. at 1116–17; *Boggi,* 74 F.3d at 478. Under the standard articulated in *Dunnigan,* the testimony of Blackwell constituted obstruction of justice which warrants an upward adjustment of two levels, pursuant to Section 3C1.1.

### N. *Recusal*

After findings were made regarding the Government's objections to the Presentence Investigation Report, the parties were given the opportunity to address where Blackwell should be sentenced within the resulting sentencing range.[25] Blackwell put her family

---

**24.** Section 3C1.1 provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.
> *Id.*

**25.** The events leading to the determination, *sua sponte,* that recusal was necessary occurred after the Government's argument for a two-level enhancement, pursuant to Section 3B1.3, was rejected and the finding that Blackwell's perjured testimony warranted a two-level upward adjustment, pursuant to Section 3C1.1, was made. The subsequent events which resulted in recusal

circumstances in issue.[26]

The Presentence Investigation Report indicated that Blackwell and McNeil, parents of a four-year-old child, were married on 20 October 1996. Presentence Investigation Report, ¶ 56. As noted, McNeil shortly thereafter passed away. Blackwell informed the Department of Probation she would be forced to leave her child in the care of one of her relatives during the period of her incarceration. *Id.* The Presentence Investigation Report indicated "Blackwell believ[ed] the separation will sacrifice her daughter's emotional health, especially considering her father's recent death." *Id.*

 "Family ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6 (policy statement). Accordingly, "family ties and responsibilities" are a discouraged basis for departure from the Guidelines. *See Koon v. United States,* — U.S. —, —, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996). Only where a defendant's family responsibilities are "extraordinary" is it appropriate to depart. *United States v. Higgins,* 967 F.2d 841, 845 (3d Cir.1992). A downward departure is generally not warranted simply because the defendant is a single parent. The Circuit has observed:

> While district courts have the authority to depart for extraordinary family circumstances, every court to consider the issue of departure based on the effect that sen-

tencing a single parent to prison will have on minor children has found the circumstances not to be extraordinary.

*United States v. Headley,* 923 F.2d 1079, 1083 (3d Cir.1991) (discussing *United States v. Brand,* 907 F.2d 31 (4th Cir.), *cert. denied,* 498 U.S. 1014, 111 S.Ct. 585, 112 L.Ed.2d 590 (1990)) ("Although there doubtless are circumstances in which unique family responsibilities might justify a downward departure, the imprisonment of a single parent was not extraordinary."); *United States v. Goff,* 907 F.2d 1441, 1446 (4th Cir.1990)).

 During the Sentencing Hearing, Blackwell argued:

> THE DEFENDANT: I don't think it's fair that my daughter has to be punished in light of this . . . . My daughter is four years old, my husband just died. She is devastated by this. To have me taken away from her so immediately after the death of her father would be devastating. I'm not a threat to anybody and I don't see why I should have to be taken away from her. I don't think it's fair . . . .
>
> My daughter would have to live with people who she doesn't know. She knows—she was raised—she's four. She was raised with me in south Jersey up until last year. She's never been away from me.
>
> She's going to have to be with my sister in Hoboken, [who] has four children, in a two-bedroom apartment.

---

were unrelated to and had no effect on these findings.

**26.** At the Sentencing Hearing, Blackwell submitted, *pro se,* an incomplete motion (the "Blackwell Motion"). The Blackwell Motion requests: (1) a new trial or directed verdict of not guilty; (2) a new attorney; (3) abatement of the Indictment against Charles McNeil; (4) an opportunity to supplement the filed Certification. Letter of Dorothy (Blackwell) McNeil, dated 5 December 1996. The Blackwell Motion includes a Certification of Dorothy Blackwell (the "Blackwell Cert."). In the Blackwell Cert., Blackwell conclusorily objects to the entire Presentence Investigation Report. Blackwell Cert., ¶ 5, at 1. Blackwell, moreover, expresses her dissatisfaction with the efforts of counsel for Defendants. *Id.,* ¶¶ 1–2, at 2–5.

Blackwell's expressed belief that counsel for Defendants were ineffective is without basis. The efforts of defense counsel, particularly coun-

sel for Blackwell, have been thorough and professional. Defendants were convicted because the evidence of their guilt was overwhelming, not because their counsel were ineffective.

Blackwell indicated that she was unable to complete the Blackwell Motion and that she desired to address the following issues at the Sentencing Hearing: "A. Hudson City Savings Bank. B. Casino Records[.] C. Prosecutorial Misconduct. D. General Objection to [Presentence Investigation Report]. D. (sic) Downward Departure Re: Sentencing Guidelines (sic)." Letter of Dorothy Blackwell, dated 5 December 1996. At the conclusion of the Sentencing Hearing, Blackwell was given until 3 January 1996 to complete and file the Blackwell Motion. This deadline was later extended at Blackwell's request.

The other choice that I have for her is send her to Colorado to my niece who she's only seen once. She also has three children and also lives in a two-bedroom apartment.

The third and final choice that I have for my daughter is my mother who is 81 years old in Florida. She's only seen her twice in her life and all of these things combined at once is just—I think it's just unfair to her.

Sentencing Hearing Tr. at 8, 12. Blackwell asked that no term of imprisonment be imposed because of these circumstances. *Id.* at 13.

At the time of the Sentencing Hearing, an unrelated case involving the sentencing of a single parent, was scheduled for sentencing the next day. In *Bissell,* 954 F.Supp. 841, despite the Circuit precedent disfavoring downward departure because of family circumstances, the Government "consented to a measured downward departure of 3 guidelines levels" for the sentencing of Barbara Bissell. 954 F.Supp. at 894.

*Bissell* involved the indictment and conviction of Nicholas Bissell, Barbara Bissell's husband, who was the former Prosecutor of Somerset County. *Bissell,* 954 F.Supp. at 850. Nicholas Bissell's flight from justice following conviction and subsequent suicide made Barbara Bissell's sentencing a publicized event. In *Bissell,* the Government's argument that a three-level departure was appropriate was rejected; however, a two-level downward departure was given to recognize the trauma caused to the Bissell children by the highly publicized suicide of their father. 954 F.Supp. at 895–96.

The Assistant United States Attorney, who tried the case, indicated he did not have the authority "to take a position [regarding Blackwell's request for a downward depar-

ture] one way or the other." Sentencing Hearing Tr. at 14. At that point, it was observed that a supervisor (the "Supervisor") from the United States Attorney's Office [27] was present in the courtroom observing the proceedings; accordingly, counsel was given the opportunity to confer with the Supervisor regarding Blackwell's request. After conferring, counsel informed the court he had "been advised on behalf of the Government *not to oppose a three-level downward departure based on ... Blackwell's family circumstances.*" *Id.* at 14 (emphasis added). Because counsel was unable to provide a basis for the Government's decision to consent to a three-level downward departure, the Supervisor was asked to explain the Government's position. The following discussion ensued:

THE COURT: This has nothing to do with the Barbara Bissell Case that's going to be sentenced tomorrow, does it?

[THE SUPERVISOR]: No, it doesn't.

THE COURT: You know, I don't believe that.... I'll tell you right on the record.... I don't accept that representation, I think it's disingenuous.

[THE SUPERVISOR]: I'm sorry your Honor doesn't believe me. I'm telling you we attempt to judge every one of our cases on its own merits and we made an attempt to do this in a very quick fashion. *Your Honor's not given us any time at all to discuss this.*

\* \* \* \* \* \*

THE COURT: How much time do you want?

\* \* \* \* \* \*

[THE SUPERVISOR]: ... I don't want any time, your Honor.

THE COURT: You just told me a few moments ago you didn't have time.

[THE SUPERVISOR]: I'm trying to explain to you why you are putting us in a difficult position.

---

**27.** A supervisor's presence at the Sentencing Hearing was quite unusual. The Assistant United States Attorney who tried the case is a competent and experienced attorney. Sentencing hearings, such as the one at issue, are not complicated legal proceedings. As indicated, the Government offered only two objections to the Presentence Investigation Report; neither objection was substantial.

Supervisors from the Office of the United States Attorney are almost never observed in court on such routine matters, especially when an experienced Assistant United States Attorney is handling the matter.

THE COURT: Tell me the time you want.

[THE SUPERVISOR]: I'm not asking for any time.

Sentencing Hearing Tr. at 17–19 (emphasis added).

As indicated, the Supervisor's representations regarding the Government's position on the Motion for Downward Departure were considered disingenuous. This finding was made based upon the totality of the circumstances surrounding his representations, including (1) the Government in the instant case took the identical unusual position with regard to the Motion for Downward Departure as it had in the *Bissell* case, with regard to the family circumstances of Barbara Bissell; (2) despite the Supervisor's representation that the Government "judge[s] each case on its own merits," Sentencing Hearing Tr. at 17, the Government consented to a three-level downward departure—exactly the degree of departure consented to in the *Bissell* case; (3) the Supervisor's curious argument that the Government needed more time to address the Downward Departure Motion and his later representation that no time was needed; and finally (4) the Supervisor's demeanor and comportment.

It was apparent the comments of the Supervisor were disingenuous. Adding to the questionable comments of the Supervisor was the sentencing of an inner-city defendant a few days before the *Blackwell* sentencing. That defendant, a single mother with two minor children, did not receive the benefit of a similar Government position. The fact that the Government sought to take a position in *Blackwell* consistent with the recent reversal of its position in *Bissell* was not significant. The incredulity of the comments by the Supervisor was significant and it was for this reason alone recusal was appropriate.

Because of the findings regarding the veracity of the Supervisor's representations, and because of concern a ruling on Blackwell's application for no prison time could appear to have been influenced by the court's reaction to the incredible statements of the

Supervisor, it was determined, *sua sponte*, that recusal from that point forward was appropriate. *See* 28 U.S.C. § 455(a).[28] Accordingly, the instant action was reassigned by an order of Chief Judge Anne E. Thompson, dated 5 December 1996.

*Conclusion*

For the reasons set forth above, Defendants' Motions were denied; the Government's motion for reciprocal discovery, the Demonstrative Charts and Summary Witnesses Motion and the Rule 803(6) Motion were granted. The Pre–Marked Exhibit Motion and the Judicial Notice Motion became moot during the course of trial. The Government's argument for an upward adjustment to Blackwell's sentence, pursuant to Section 3B1.3, because she abused a position of trust, was rejected. Blackwell's sentence was enhanced two-levels, pursuant to Section 3C1.1, because of her perjury at trial. The instant case was reassigned for the remaining issues regarding Blackwell's sentencing.

---

28. Section 455(a) provides:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself [or her-

self] in any proceeding in which his [or her] impartiality might reasonably be questioned. *Id.*